MARTIN PRINTING, INC. *v.* ANDRES J. SONE ET AL.
(AC 25435)

Schaller, McLachlan and Dupont, Js.

Submitted on briefs February 15[1]—officially released May 31, 2005

*Richard J. Novak* filed a brief for the appellant (defendant Gary R. Towler).

*W. Glen Pierson* filed a brief for the appellee (plaintiff).

*Opinion*

DUPONT, J. The defendant Gary R. Towler[2] appeals from the judgment of the trial court rendered in favor

---

[1] Counsel for the plaintiff, Martin Printing, Inc., appeared for oral argument on February 15, 2005, although counsel for the defendant Gary R. Towler, the only defendant involved in this appeal, did not. The plaintiff waived oral argument, and the appeal was decided on the briefs and the record.

[2] Two other individuals, Andres J. Sone and H. James Kuhe, and a corporation, Abbey, Inc., also were named as defendants. During the pendency of this case, Sone and H. James Kuhe died. Rachel Kuhe, the administratrix of the estate of H. James Kuhe, was substituted as a defendant. On May 27,

of the plaintiff, Martin Printing, Inc., in the amount of $79,932, plus costs, following a trial to the court. The defendant claims on appeal that the court improperly (1) ordered the plaintiff to amend its complaint, post-trial, to conform to the evidence adduced at trial and (2) concluded that the personal guarantee the defendant executed was valid and enforceable. We disagree and affirm the judgment of the trial court.

The following facts as found by the court and set forth in its memorandum of decision filed April 19, 2004, are relevant to our disposition of the defendant's claims on appeal. The plaintiff is a commercial printing company in North Haven that prints magazines, brochures and flyers. Martin D. Santacroce is the plaintiff's president and owner. In December, 2001, a representative of the plaintiff began negotiations with representatives of Abbey, Inc. (Abbey), concerning the printing of a magazine known as "Pub Links Golfer Magazine" (magazine), which is distributed nationally. Abbey publishes the magazine six times per year. The defendant is the president of Abbey, and H. James Kuhe was its treasurer and vice president of finance. Andres J. Sone was the publisher of the magazine. All were sophisticated businessmen at all times relevant to this action.

In late 2001, representatives of the plaintiff and Abbey began negotiating what the parties intended would be a long-term business relationship. The parties understood that the plaintiff would print six bimonthly issues of the magazine. In December, 2001, the plaintiff submitted a proposal for printing expenses to Abbey, and Abbey completed one of the plaintiff's credit applications on December 20, 2001. The court specifically found that

2003, the plaintiff withdrew all claims against Sone. On September 10, 2003, Abbey, Inc., stipulated to a judgment in favor of the plaintiff, Martin Printing, Inc., in the amount of $79,932. Because Rachel Kuhe has not appealed, Towler is the only defendant involved in this appeal. We therefore refer to him in this opinion as the defendant.

the parties intended that the plaintiff would extend short-term credit to Abbey for printing expenses.

The plaintiff printed the January-February, 2002 issue of the magazine, and in an invoice dated January 31, 2002, billed Abbey $44,459.90 for the printing expenses. Abbey failed to pay that charge within the allowed forty-five day grace period. The plaintiff incurred substantial costs in printing the magazine. Santacroce became concerned that payment was not forthcoming from Abbey because it was a financial burden for the plaintiff, and it was contrary to the expected success of an ongoing, mutually beneficial business relationship. After issuing the January 31, 2002 invoice, the plaintiff began to print the March-April, 2002 issue of the magazine, for which the plaintiff sent Abbey an invoice, dated March 31, 2002, in the amount of $79,932 for the cost of printing that issue. As of March 31, 2002, Abbey had not paid for the printing cost of the January-February, 2002 issue of the magazine, which compounded the ongoing detrimental financial impact on the plaintiff.

On April 5, 2002, after Santacroce requested that the defendant and H. James Kuhe personally guarantee past and future printing expenses, the defendant executed a document entitled "Guaranty Agreement."[3] The executed agreement provides in relevant part: "For and in consideration of credit extended or to be extended by [the plaintiff], its successors or assigns, to and at the request of [the defendant] (hereinafter called 'Purchaser') the undersigned, jointly and severally, do hereby unconditionally guarantee the payment at respective maturity dates if any and all indebtedness of any kind whatsoever, whether now due or which may hereafter become due from Purchaser to [the plaintiff] . . . and hereby agree to pay punctually such indebtedness, plus interest at the maximum rate

---

[3] On April 8, 2002, H. James Kuhe executed a similar document.

allowed by law together with all costs of collection (including a reasonable attorney's fee), if default in payment thereof be made by Purchaser." The court found that the defendant was not forced or coerced into signing the guarantee agreement.

On April 12, 2002, the plaintiff received a check from Abbey in the amount of $44,894.90 for payment of the January-February, 2002 issue of the magazine. On May 27, 2002, Kuhe, on behalf of Abbey, executed a check in the amount of $79,932 as payment for the March-April, 2002 issue of the magazine. There were insufficient funds in Abbey's account to cover the amount of the check. The outstanding debt was $79,932.

Trial occurred in two phases, the first part taking place on September 10, 2003, and the second part on March 29, 2004. During the first phase of the trial, the parties stipulated to a judgment in favor of the plaintiff against Abbey in the amount of $79,932. On that same day, the plaintiff introduced evidence in support of its claim against the defendant on the issue of the personal guarantee. The parties were ordered to file posttrial briefs by October 15, 2003.[4] On December 18, 2003, the plaintiff filed its posttrial brief in which it argued that the personal guarantee executed by the defendant was the basis for his liability to the plaintiff.

On February 20, 2004, the court issued the following order: "The plaintiff is ordered to file a second amended complaint no later than March 1, 2004, which conforms to the evidence presented at trial . . . . The amended complaint filed on October 16, 2003, fails to allege the execution of [the] personal [guarantee] from [the defendant] for debts incurred by [Abbey]." On March 1, 2004,

---

[4] On October 8, 2003, the defendant filed a motion for an extension of time to file his memorandum, which the court granted without objection by the plaintiff. Our review of the record indicates that the defendant never filed his posttrial brief as ordered by the court.

the plaintiff filed its second amended complaint in accord with the court's order in which it alleged, in count five, a breach by the defendant of the guarantee agreement executed on April 5, 2002. On March 8, 2004, the defendant filed his second amended answer, admitting all of the new allegations in count five of the plaintiff's second amended complaint except the amount in controversy. The defendant also asserted two special defenses alleging that the guarantee agreement was unenforceable because it was (1) not supported by consideration and (2) executed under duress.

On April 19, 2004, the court rendered judgment in favor of the plaintiff in the amount of $79,932 plus costs. This appeal followed. Additional facts will be set forth as necessary.

I

COURT'S ORDER REGARDING THE PLAINTIFF'S
SECOND AMENDED COMPLAINT

The defendant first claims that the court improperly ordered the plaintiff to file its second amended complaint to conform to the evidence adduced at trial and, therefore, improperly granted the plaintiff relief on a cause of action that had not been raised in its previous pleadings. Practice Book § 10-60 (a)[5] provides for the

[5] Practice Book § 10-60 (a) provides: "Except as provided in Section 10-66, a party may amend his or her pleadings or other parts of the record or proceedings at any time subsequent to that stated in the preceding section in the following manner:

"(1) By order of judicial authority; or

"(2) By written consent of the adverse party; or

"(3) By filing a request for leave to file such amendment, with the amendment appended, after service upon each party as provided by Sections 10-12 through 10-17, and with proof of service endorsed thereon. If no objection thereto has been filed by any party within fifteen days from the date of the filing of said request, the amendment shall be deemed to have been filed by consent of the adverse party. If an opposing party shall have objection to any part of such request or the amendment appended thereto, such objection in writing specifying the particular paragraph or paragraphs to which there is objection and the reasons therefor, shall, after service upon each party as provided by Sections 10-12 through 10-17 and with proof of

amendment of pleadings at any time by consent of all of the parties, judicial order or failure by the adverse party to object. "A trial court may allow, in its discretion, an amendment to pleadings before, during, or after trial to conform to the proof. . . . Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The essential tests are whether the ruling of the court will work an injustice to either the plaintiff or the defendant and whether the granting of the motion will unduly delay a trial." (Citations omitted; internal quotation marks omitted.) *Franc* v. *Bethel Holding Co.*, 73 Conn. App. 114, 132, 807 A.2d 519, cert. granted on other grounds, 262 Conn. 923, 812 A.2d 864 (2002) (appeal withdrawn October 21, 2003).

In this case, the plaintiff filed its second amended complaint on March 1, 2004, pursuant to an order by the court at the specific request of the defendant, which request was made in open court. On September 10, 2003, the following exchange took place at trial:

"[The Defendant's Counsel]: Your Honor, if I may address the court. I would ask that the plaintiff, if [it is] going to proceed on the guarantor aspect, amend [its] pleadings to conform to the proof today. Because there is not present in the complaint, [it] is naming [the defendant] as a principal, rather than as a guarantor.

"[The Plaintiff's Counsel]: Yes, Your Honor, we can do that.

"The Court: Sure."

service endorsed thereon, be filed with the clerk within the time specified above and placed upon the next short calendar list."

Practice Book § 10-66 relates to amendments concerning a party's statement of the amount of demand and is not relevant here.

The defendant now claims that the court "erred in granting relief to the plaintiff on a cause of action that had never been raised in any of the pleadings or even been the subject of a single discovery request. From the pleadings, [the defendant] had no reason to suspect that [the] plaintiff sought to enforce his personal guarantee until the time of the trial, when [the] plaintiff revealed that this was the sole basis upon which relief was sought from [the defendant]." The defendant further contends that allowing the plaintiff to amend its complaint posttrial prejudiced him because he was not able to "seek some recourse in the form of, perhaps, posttrial discovery regarding the personal guarantees," thus precluding him from mounting an adequate defense.

It cannot be disputed seriously that the defendant had notice, prior to the first phase of the trial, which occurred on September 10, 2003, that the plaintiff sought relief on the basis of the personal guarantee that is the subject of this appeal. First, the original answer and special defense filed by the defendant, H. James Kuhe and Abbey on March 5, 2003, provides: "If the [defendant] and H. James Kuhe ever made, executed, signed and delivered any personal guarantees in favor of the [p]laintiff, said personal guarantees . . . were made, executed, signed and delivered without consideration on [the] [p]laintiff's part, and the [defendant] and H. James Kuhe owe [the] [p]laintiff nothing." Second, on September 10, 2003, before the plaintiff began its case, the defendant requested that the plaintiff file an amended complaint to conform to the proof concerning the personal guarantee that would be offered that day. Finally, the defendant introduced evidence in support of his theory that the personal guarantee he executed was unenforceable insofar as it was not supported by consideration and was executed under duress.

The plaintiff concedes that all of the evidence relevant to its claims against the defendant was presented on September 10, 2003, and that the trial was continued to March 29, 2004. The defendant had, at a minimum,[6] more than six months, therefore, to assess how he would handle the issue of the personal guarantee. Indeed, the defendant, notwithstanding an order by the court, declined to file a posttrial brief in which he could have mounted additional defenses against the alleged liability under the personal guarantee. Instead, the defendant remains steadfast in concluding that because the plaintiff did not specifically rely on the personal guarantee as its basis for recovery in its original complaint, even though its evidence at trial focused exclusively on the personal guarantee executed by the defendant, the plaintiff cannot recover on the basis of the guarantee. Any variance between the original pleading and the proof did not mislead or surprise the defendant and was waived by the defendant in this case. See *Tedesco* v. *Stamford*, 215 Conn. 450, 463, 576 A.2d 1273 (1990), on remand, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992). Our Supreme Court has repeatedly "eschewed applying the law in such a hypertechnical manner so as to elevate form over substance." *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 34, 848 A.2d 418 (2004). We conclude that the defendant has not demonstrated that the court clearly abused its discretion in ordering the plaintiff to amend its complaint, posttrial, to conform to the evidence adduced at trial.

## II

## GUARANTEE AGREEMENT

We next address the defendant's claim that the court improperly concluded that the personal guarantee exe-

---

[6] On the basis of the original special defense filed on March 5, 2003, the defendant had full notice that the plaintiff intended to seek relief on the basis of, inter alia, the personal guarantee executed by the defendant. As such, the defendant had a full year to prepare and to mount a defense

cuted by the defendant was supported by consideration. Specifically, the defendant argues that he did not execute the guarantee until after the plaintiff's full and final performance of its legal obligations and that the guarantee was not supported by consideration. He claims, therefore, that the suretyship contract is unenforceable as a matter of law.

We start by setting forth the applicable legal principles and standard of review. "It almost goes without saying that consideration is [t]hat which is bargained-for by the promisor and given in exchange for the promise by the promisee . . . . We also note that [t]he doctrine of consideration does not require or imply an equal exchange between the contracting parties. . . . Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard." (Citations omitted; internal quotation marks omitted.) *Benedetto* v. *Wanat*, 79 Conn. App. 139, 150, 829 A.2d 901 (2003). "A promise to be surety for the performance of a contractual obligation, made to the obligee, is binding if (a) the promise is in writing and signed by the promisor and recites a purported consideration; or . . . (c) the promisor should reasonably expect the promise to induce action or forbearance of a substantial character on the part of the promisee or a third person, and the promise does induce such action or forbearance." 1 Restatement (Second), Contracts § 88 (1981).[7]

---

against the plaintiff's claim that was based on the guarantee before the plaintiff filed its second amended complaint, in which it specifically referred to the guarantee as a basis for recovery against the defendant.

[7] Our Supreme Court has favorably cited § 88 of the Restatement (Second) of Contracts. See *Connecticut Bank & Trust Co.* v. *Wilcox*, 201 Conn. 570, 576, 518 A.2d 928 (1986); see also *Superior Wire & Paper Products, Ltd.* v. *Talcott Tool & Machine, Inc.*, 184 Conn. 10, 20, 441 A.2d 43 (1981) (citing Restatement [Second], Contracts § 89C [Tent. Ed. 1973]).

In this case, the court found that the personal guarantee executed by the defendant was supported by consideration, namely, the extension by the plaintiff of short-term credit to Abbey. Specifically, the court found that Abbey had completed a credit application on December 20, 2001, to facilitate the business arrangement. The court also found that the availability of credit to cover the printing costs was essential because the parties contemplated that the plaintiff would print six bimonthly issues of the magazine. Finally, the court found that as of March 31, 2002, Abbey had not paid for the printing costs of the January-February, 2002 issue of the magazine, thereby exceeding the agreed on forty-five day grace period for payment of amounts due.

The defendant disputes the court's factual findings, asserting that "[t]here was, quite plainly put . . . absolutely no evidence offered to support the court's conclusion that future credit was to be extended." Our review of the record reveals that the evidence offered demonstrates, unequivocally, that at the time the personal guarantee agreement was executed, Abbey had not paid the amounts due for the January-February, 2002 issue of the magazine, nor had it paid the amount due for the March-April, 2002 issue for which Abbey had received an invoice that showed the cost of the March-April issue to be $79,932. Furthermore, ample support existed for the court to find that the parties had contemplated that the plaintiff would publish six bimonthly issues of the magazine.[8] The plaintiff's president testified that it was the intention of the plaintiff and Abbey

---

[8] On direct examination, Santacroce testified as follows:

"[The Plaintiff's Counsel]: Okay. And tell the court what the nature of the relationship was between [the plaintiff] and [Abbey].

"[The Witness]: We, we were approached by our salesman and a prep house called Gamma One [that] was doing the film work for the [magazine], indicating to us that [Abbey] wanted to, wanted a printer that was closer to the, where the prep was being produced, so that they could see everything when they came down close by. We were told that [the magazine] was for the public golf courses and that it was being produced every two months. So, it would be six issues. . . .

that the plaintiff would print six issues of the magazine, and that the plaintiff would extend short-term credit to Abbey. The defendant vigorously challenged both of those assertions during his cross-examination of Santacroce and testified in rebuttal.

"It is within the province of the trial court, when sitting as the fact finder, to weigh the evidence pre-

"[The Plaintiff's Counsel]: All right. And was it your understanding that you were being hired to do the printing of these magazines on behalf of [Abbey] on a bimonthly basis?

"[The Witness]: That's correct.

"[The Plaintiff's Counsel]: Okay. And in order to do so, did you quote a certain price for these publications of these magazines on an ongoing basis?

"[The Witness]: Yes. Because they had to go to various locations, they were all drop shipments all over the country, good part of the country, we had to come up with a per piece price. And that's what we did."

In connection with the plaintiff's request that the defendant execute the personal guarantee, Santacroce testified as follows:

"[The Plaintiff's Counsel]: Were the terms of the agreement between [the plaintiff] and [Abbey] that [it was] to pay invoices on a term of forty-five days?

"[The Witness]: It was supposed to be between thirty and forty-five days, before the next issue was to be sent out.

"[The Plaintiff's Counsel]: Did [Abbey] pay the invoice [for the January-February, 2002 issue] within thirty to forty-five days of you sending out the invoice to [it]?

"[The Witness]: No.

"[The Plaintiff's Counsel]: Okay. Now, after sending out the invoice . . . did you begin the process of the printing of the next issue that was going to be published?

"[The Witness]: Yes. . . .

"[The Plaintiff's Counsel]: And you did not receive payment on the first issue before you began the process of the second issue?

"[The Witness]: That's correct. . . .

"[The Plaintiff's Counsel]: All right. As a result of that, did something happen, did you request something?

"[The Witness]: We requested that since we were going to be in a long-term relationship, we were supposed to do this every, like I said, six issues a year, that we wanted some guarantee that once we got involved with these carryovers, that we wouldn't be left out because we were paying for not only the paper and the manufacturing of it, but also the perfect binding, which is an outside function.

"[The Plaintiff's Counsel]: So, as a result of that did you request from the principals of Abbey . . . personal guarantees?

"[The Witness]: That's correct."

sented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom. . . . As a practical matter, it is inappropriate to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record." (Citations omitted; internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 40, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004). Accordingly, we defer to the court's credibility assessments and conclude that there was ample evidence in the record to support the court's conclusion that the personal guarantee was supported by consideration. Furthermore, the guarantee was enforceable under either subsection (a) or (c) of 1 Restatement (Second), Contracts, supra, § 88, and the court correctly rendered judgment in favor of the plaintiff.

The judgment is affirmed.

In this opinion the other judges concurred.