JOANNE TORNAQUINDICI ET AL. *v.* JOHN M.
KEGGI ET AL.
(AC 25605)

Bishop, DiPentima and Berdon, Js.

Argued October 19, 2005—officially released April 18, 2006

*Augustus R. Southworth III*, with whom, on the brief, was *Isabella S. Murray*, for the appellants (named defendant et al.).

*Hope C. Seeley*, with whom was *Sandra L. Snaden*, for the appellee (named plaintiff).

*Opinion*

BERDON, J. This appeal calls on us to resolve a number of issues arising out of the jury trial of an action for medical malpractice brought by the plaintiff Joanne

Tornaquindici[1] against the defendant John M. Keggi,[2] a physician. The jury returned a verdict in favor of the plaintiff for $157,000 in economic damages and $400,000 in noneconomic damages. The defendant filed this appeal, claiming that the trial court (1) should have set aside the verdict because (a) the plaintiff's counsel made prejudicial accusations in closing arguments to the jury, (b) the verdict was against the evidence and (c) there was no properly admitted evidence that the defendant failed to communicate accurate information to the plaintiff postoperatively or that any withholding of such information was the proximate cause of any injury to the plaintiff; (2) improperly allowed the plaintiff to amend her complaint on "the eve of closing arguments"; (3) failed to instruct the jury properly as to the standard of care; and (4) improperly precluded the defendant's expert witness from testifying. We affirm the judgment of the trial court.

In February, 1999, the plaintiff slipped and fell while at work, landing on the right side of her buttock and lower back, causing injury to her hip. As a result of the fall, the plaintiff suffered considerable pain and was treated by several physicians. After undergoing various treatments, including a right hip arthroscopy and right hip anthrogram, she ultimately consulted with the defendant regarding surgery to address her pain.

The jury reasonably could have found the following additional facts. On March 13, 2001, the defendant performed on the plaintiff an intramuscular psoas tendon

[1] The action was also brought by Tony Tornaquindici, who sought damages for loss of consortium as the husband of the plaintiff Joanne Tornaquindici. The jury, however, did not award any damages to him, and he did not appeal. Accordingly, in this opinion we refer solely to Joanne Tornaquindici as the plaintiff.

[2] The judgment for the plaintiff was also rendered against Keggi's employer, Orthopedic Surgery, P.C., and its liability is identical to that of Keggi. Accordingly, in this opinion we refer solely to Keggi as the defendant.

lengthening, right hip arthrotomy for labral tear and debridement of the psoas bursa. During surgery, the defendant caused injury to a structure that he initially thought was the plaintiff's tendon but later discovered was her femoral nerve. Following surgery, the plaintiff complained of numbness in her thigh, decreased sensation, reduced movement and burning pain in her leg. The defendant did not inform the plaintiff that he had cut a structure that he first thought was her tendon but later discovered was not, and omitted this information from his operative and postsurgical notes and the discharge summary. Rather, the plaintiff was informed after surgery that she suffered from femoral nerve palsy.

After the surgery, the plaintiff continued to feel pain and consulted with pain management and nerve specialists. She eventually learned that she had the lesion on her femoral nerve. Thereafter, the plaintiff underwent two surgeries in March and June, 2002, which helped to lessen, but did not eliminate, the persistent pain.

On December 4, 2001, the plaintiff brought this medical malpractice action against the defendant, alleging negligence and failure to disclose information. On April 20, 2004, following a ten day trial, the jury answered a set of interrogatories[3] and returned its verdict in favor of the plaintiff.

---

[3] The following interrogatories were answered by the jury:

"A. AS TO THE DEFENDANT . . .

"1. Do you find that [the defendant] breached the standard of care in his care and treatment of the plaintiff . . . in one or more of the ways alleged in the [c]omplaint, as follows . . .

"a. By failing to exercise that skill and expertise as would any reasonably prudent practitioner in his dissection and exposure of the femoral nerve when he performed an elective psoas tendon lengthening, debridement psoas bursa, arthrotomy of right hip, partial labral resection on March 13, 2001?

"ANSWER: [Yes]

"b. By failing to carefully isolate the femoral nerve in order that the nerve was not injured?

"ANSWER: [No]

"c. By failing to communicate accurate information regarding what occurred during surgery to his patient, or to refer to the same in his progress

On April 29, 2004, the defendant filed a motion to set aside the verdict and for a new trial, and for judgment notwithstanding the verdict, to which the plaintiff objected. On June 25, 2004, after hearing argument from both parties, the court denied the defendant's motion. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant filed a motion to set aside the verdict and for a new trial on several grounds. "Our standard of review of a court's granting of a motion for a directed verdict or a motion to set aside the verdict is well settled. [T]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict . . . [is] the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable

notes which constituted a further deviation from the standard of care that kept the patient ignorant of the true medical facts and pathology underlying her injury.

"ANSWER: [Yes]

"d. By cutting into the femoral nerve because he misidentified it as the iliopsoas tendon?

"ANSWER: [No]

"e. By failing to attempt an immediate repair of the femoral nerve?

"ANSWER: [No]

"PLEASE NOTE: If your answer to Interrogatories number 1 (a through e) is NO, you are to enter a Defendant's Verdict on Count One and Count Two of the Complaint, in accordance with the Defendant's Verdict Form. Skip Section B and proceed to Section C.

"2. If your answer to any subpart of jury interrogatory number 1 (a through e) is YES, proceed to Section B:

"B. CAUSATION:

"1. Do you find that the breach of the standard of care which you find to have been proven in Section A of the Interrogatories was the proximate cause of the injuries claimed by the plaintiff?

"ANSWER: [Yes]

"2. If the answer to this interrogatory is Yes, please indicate the subsections of Interrogatory 1 (a through e) that you have concluded were the cause of [the] plaintiff's injury.

"[ANSWER: A & C]"

presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." (Internal quotation marks omitted.) *Malloy* v. *Colchester*, 85 Conn. App. 627, 632, 858 A.2d 813, cert. denied, 272 Conn. 907, 863 A.2d 698 (2004).

A

The defendant first claims that the court should have granted his motion to set aside the verdict and for a new trial because the plaintiff's counsel made prejudicial accusations in closing arguments. Specifically, the defendant claims that the plaintiff's closing argument repeatedly associated him with infamous members of various professions who recently were newsworthy for sexual abuse, corruption, dishonesty and unsound business practices, which inflamed the jury, resulting in great prejudice to him.[4] We disagree.

---

[4] In closing argument, the plaintiff's counsel stated in relevant part: "I don't think we need to be orthopedic surgeons to understand people. We can imagine that a well trained and highly skilled surgeon, as [the defendant] is, who makes a medical error is going to feel powerful emotions. We all feel emotions when we make mistakes, especially ones that we shouldn't make, that we know we're better than that. They may feel angry, they may feel apprehension, they certainly may feel concern about their patient. They also feel that they're the only orthopedic surgeon in the room, and nobody's going to call into question anything they do, especially if they don't point it out to anybody. And they might just contemplate the potential consequences themselves to their career or embarrassment or possible adverse consequences like a lawsuit.

"Now, is that any different at all from late at night when somebody hits something in the middle of the road and for brief seconds says, you know, it could have been a person but there's nobody around; I think I'm just going to assume it's not and go on my merry way? And, you know, we've had fine people, people of substance, decent people who have succumbed to that temptation. It has been in the media over the past few years; we've had a couple of people; I'm not going to—and we all know that it can

"Where a claim is made that remarks by opposing counsel jeopardized a party's right to a fair trial, [a] verdict should be set aside if there has been manifest injury to a litigant, and it is singularly the trial court's function to assess when such injury has been done since it is only that court which can appraise the atmosphere prevailing in the courtroom. . . . The trial judge has discretion as to the latitude of the statements of counsel made during argument." (Internal quotation marks omitted.) *Murray* v. *Taylor*, 65 Conn. App. 300, 306, 782 A.2d 702, cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001).

"In every case . . . involving improper argument, there are two questions. The first is whether the remarks were improper, and the second is whether, if the remarks were improper, a new trial is necessary. . . . Comments of attorneys that are proscribed in both civil and criminal cases . . . [include] appeals to the emotions, passions and prejudices of the jurors. . . . Closing argument in civil cases, deemed improper . . . to warrant the granting of a motion to set aside the verdict and to order a new trial, includes calling the opposing side's arguments a combination of 'sleaze, slime and innuendo,' and characterizing the testimony of a defendant as 'weasel words' . . . or arguing that the defendants provided testimony to 'save their filthy money' . . . or asking the jurors to imagine that they had suffered the same injury when assessing damages, and discussing the [defendant's] lack of insurance and the

happen. And is leaving the scene of an accident late at night any different than leaving the scene of a surgical accident in a situation like this? . . . Now, the verdict itself . . . as a societal matter, it's important . . . because it really does tell [the defendant] and anybody else who ever may be listening that no one's above the law here. You know, it applies to everybody. And whether you're a president, a priest, or a business tycoon on Wall Street, the standards are the same. You can't—you can't do what you've done and evade it; no matter how vigorously you deny it, we're just not going to tolerate it."

impact on the jury's decision if one of the jurors' children had visited the [the defendant] and was injured . . . or arguing that defense counsel used tactics like criminal defense lawyers in sexual assault cases. . . . A verdict should be set aside and a new trial ordered, however, if counsel has misstated the law, despite a court's prior ruling . . . ." (Citations omitted.) *Palkimas* v. *Lavine*, 71 Conn. App. 537, 546–47, 803 A.2d 329, cert. denied, 262 Conn. 919, 812 A.2d 863 (2002).

During closing argument in the case at hand, in the course of inviting the jury to imagine what a "well trained and highly skilled surgeon" like the defendant might be thinking and feeling after having committed a medical error, the plaintiff's counsel compared surgical accidents to late night automobile accidents and stated that presidents, priests and business tycoons also succumb to the temptation of walking away from their mistakes to avoid embarrassment, damage to their careers or lawsuits. The plaintiff's counsel also invited the jury to send a message to the defendant and "anybody else who ever may be listening" that no one is above the law.

It is difficult to imagine how these comments by the plaintiff's counsel could be construed as anything other than an appeal to the jury to decide the case on the basis of passion or prejudice. The comments were an attempt to inject extraneous issues into the case and to divert the jury from its duty to decide the case on the evidence. Imploring the jury to send a message was an improper appeal to the jury to award punitive damages in a personal injury case in which only compensatory damages were being sought. Furthermore, counsel's attempt to demean the defendant by comparing him to prominent figures recently in the media; see footnote 4; was nothing more than demagoguery that served only to belittle the judicial process.

We conclude, however, that any prejudice that may have resulted from counsel's remarks was minimal in light of the strength of the plaintiff's case, the court's jury instructions and the amount of the jury's award. In its charge to the jury, the court stated: "The final arguments or the summations of the lawyers that you heard . . . are not evidence. You can accept all of what either one of them said, you can accept some of what each one of them has said or you can even accept none of what they have said if that is your choice. . . . They made those presentations based upon their view of the evidence and their role as advocates. Your role is different, and so you have complete freedom in determining what attention, what consideration or how much consideration you will give to those arguments." The jury's interrogatory answers demonstrate that it took the instructions seriously. The jury accepted the defendant's theory that he did not cut the femoral nerve.

Additionally, we agree with the court that "there was nothing unreasonable or inflammatory about the amount of the verdict that was returned here, bearing in mind the damages testimony, bearing in mind such evidence proffered as [the plaintiff's] inability to work for a prolonged period of time, her age, et cetera, $557,000 is not egregious in any sense at all." In addition, "[t]hat the jury was not inflamed is further corroborated by the fact that [it] awarded nothing [for the loss of consortium claim by the plaintiff's husband], who made a good witness, but evidently decided that when we marry, we marry for better or worse and we take whatever comes. They awarded him nothing."

Furthermore, even counsel for the defendant did not feel obliged to object until ten days after closing argument when he filed his motion to set aside the verdict and for a new trial. As we have stated previously, "[t]he trial court . . . was in the best position to assess the possible prejudice, if any, that may have resulted from

counsel's comments, and to fashion an appropriate remedy from a range of possible alternatives. . . . The defendants were obliged, therefore, to raise in the trial court their objections to counsel's improper remarks. Because they failed to do so, the defendants are entitled to a new trial only if they can demonstrate that such relief is necessary to remedy a manifest injustice." (Internal quotation marks omitted.) *Murray* v. *Taylor*, supra, 65 Conn. App. 315. We are not persuaded that the defendant has met his burden.

We conclude that the parties received a fair trial. The comments of the plaintiff's counsel indeed may have been improper, but they did not deprive the defendant of a fair trial.

B

The defendant next claims that the court should have granted his motion to set aside the verdict because the verdict was against the evidence. Specifically, the defendant argues that the plaintiff offered the theory of laceration to the femoral nerve as the sole theory of what had happened and that the issue of causation had not been proven by the plaintiff. We disagree.

The basis of the defendant's claim lies in the fact that the jury's responses to the following interrogatories were in the negative: "Do you find that [the defendant] breached the standard of care in his care and treatment of the plaintiff . . . in one or more of the ways alleged in the [c]omplaint, as follows . . . [b] By failing to carefully isolate the femoral nerve in order that the nerve was not injured? . . . [d] By cutting into the femoral nerve because he misidentified it as the iliopsoas tendon?"

The jury's response to the following interrogatory, however, was in the affirmative: "Do you find that [the defendant] breached the standard of care in his care

and treatment of the plaintiff . . . in one or more of the ways alleged in the [c]omplaint, as follows . . . [a] By failing to exercise that skill and expertise as would any reasonably prudent practitioner in his dissection and exposure of the femoral nerve when he performed an elective psoas tendon lengthening, debridement psoas bursa, arthrotomy of right hip, partial labral resection on March 13, 2001?" Although the plaintiff's case focused on the claim that the defendant had cut her femoral nerve, the plaintiff's theory that the injury had been caused by a cut was not her sole theory of causation. The plaintiff offered expert testimony that the femoral nerve was exposed in such a way that it was injured and could have been injured not only by laceration but by stretching, bruising, contusing or compression.[5] Moreover, a review of the plaintiff's closing

---

[5] Cross-examination by the defendant of the plaintiff's expert, Margaret M. Baker, a physician, in pertinent part was as follows:

"Q. Can you have numbness in the thigh from a stretch injury to the femoral nerve?

"A. Yes.

"Q. Or from a retractor compression injury?

"A. Correct, either one.

"Q. Okay. And then below that it says some decreased sensation to light touch?

"A. Correct.

"Q. And, again, that can occur from a stretch injury to the femoral nerve?

"A. Correct.

"Q. It says unable to lift leg off the bed. Do you see that?

"A. Yes.

"Q. Okay. Can that occur as a consequence of a stretch injury to the femoral nerve?

"A. Yes.

"Q. Okay. And then he says . . . she has femoral nerve palsy, correct? . . .

"A. Correct.

"Q. You can have femoral nerve palsy as a consequence of a stretch injury?

"A. You can.

"Q. Can you have a femoral nerve palsy as a consequence of a retractor injury?

"A. You can, or a laceration or compression. . . .

"Q. There's a reference to burning pain in the right thigh. . . . Again, you can have those symptoms with a stretch injury to the nerve, correct?

argument reveals that the theory of laceration was offered simply as the best explanation of what likely happened. In closing argument, the plaintiff explained that the defendant deviated from a proper standard of care, exposing the nerve to injury, and that the surgical approach taken by the defendant, called the anterior proximal approach, carried an increased risk and required greater precautions. The plaintiff claimed that the defendant, however, did not take the greater precautions and exposed the nerve to injury.

Moreover, the court's decision explaining its reasoning on this issue appears thorough. The court stated: "I believe that when all of the responses to the jury interrogatories are read together, that that which they concluded was that [the defendant] did not cut the femoral nerve, but that he did expose the femoral nerve to injury. And I believe that is, in fact, supported by the evidence of [the plaintiff's expert witness, Margaret M. Baker, a physician] in a variety of ways. . . . Dr. Baker testified numerous times . . . [that] this nerve injury could have been caused by cutting . . . by stretching, by compressing and, or, by retracting. . . . What the jury clearly found was that [the defendant] exposed the femoral nerve in such a way that it was injured, and that that increased risk of exposure and injury was by virtue of the fact that he chose an approach that significantly increased that risk and in that way did not . . . apply the appropriate standard of care."

In regard to the defendant's argument that the jury's interrogatory answers were inconsistent with the ver-

---

"A. Stretch, compression or laceration. It would be hard to tell from this exam.

"Q. Okay. And just so we're clear, the symptoms that you and I have just reviewed during the course of that hospitalization can occur as a consequence of a cut, as a consequence of compression, as a consequence of stretch, correct?

"A. All of the above, correct."

dict, our Supreme Court has stated that "[w]hen a claim is made that the jury's answers to the interrogatories in returning a verdict are inconsistent, the court has the duty to attempt to harmonize the answers." (Internal quotation marks omitted.) *Boval* v. *Waterbury*, 258 Conn. 574, 588, 783 A.2d 1001 (2001).

We conclude that the jury reasonably could have found that the defendant caused injury to the plaintiff without a specific finding that the defendant lacerated the femoral nerve.

C

The defendant claims that the court should have granted the motion to set aside the verdict because there was no properly admitted evidence that he failed to communicate accurate information to the plaintiff postoperatively or that any withholding of such information was the proximate cause of any injury to her. We disagree.

We find the following reasoning of the court persuasive: "With regard to . . . the failure to communicate accurate information you have identified for me here today as the failure to identify the cutting of the femoral nerve. I don't believe that's the communication . . . that Dr. Baker had in mind. The communication was with regard to the fact that there was a complication in the surgery, and the complication was that [the defendant] cut a structure which he thought was a tendon and he later satisfied himself was not and didn't communicate that to the patient, the failure of which to do so decreased the number of options available to [the plaintiff] with regard to follow-up care and with specific regard to regeneration of the nerves that were injured and, or, may have died, and the jury found that as well."

The plaintiff testified that when she asked the defendant whether something had gone wrong during sur-

gery, she was not told that a nerve was injured. It was not until the plaintiff consulted with a different physician, a neurologist, that the injured nerve was brought to her attention. The defendant and his physician's assistant, Patricia Marriott, also testified as to the kind of information that was provided to the plaintiff. Both testified that communications with the plaintiff did not include information about a nerve injury.

The plaintiff's expert witness, Baker, testified that it was a deviation from the standard of care "that the nerve injury was not appropriately addressed expeditiously and, actually, I don't think it ever was appropriately addressed, and it became too late, basically, to recover function."

Our review of the record leads us to conclude that the plaintiff did present evidence of the defendant's failure to communicate accurate information to her postoperatively. Moreover, on the basis of the evidence presented, the jury reasonably could have found that the defendant's failure to communicate decreased the number of options available to the plaintiff for follow-up care and, in particular, for regeneration treatment of the injured nerve, thereby causing proximate harm to her.

II

The defendant claims that the court improperly allowed the plaintiff to amend her complaint on "the eve of closing arguments . . . ." We disagree.

The following additional facts are relevant to the defendant's claim. The third party intervening complaint submitted by the plaintiff's employer on February 7, 2002, had stated that the employer, under the Workers' Compensation Act, General Statutes § 31-275 et seq., had paid and become obligated to pay large sums for the plaintiff's injuries. This complaint was later with-

drawn on March 23, 2004, prior to trial. On April 15, 2004, after the close of evidence but prior to closing arguments, the plaintiff filed a motion for leave to amend her complaint in order to include medical expenses, which had been omitted from the original complaint.

"A trial court may allow, in its discretion, an amendment to pleadings before, during, or after trial to conform to the proof. . . . Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The essential tests are whether the ruling of the court will work an injustice to either the plaintiff or the defendant and whether the granting of the motion will unduly delay a trial." (Internal quotation marks omitted.) *Martin Printing, Inc.* v. *Sone*, 89 Conn. App. 336, 342, 873 A.2d 232 (2005).

We agree with the court that neither was the defendant prejudiced nor was the trial unduly delayed by permitting the plaintiff to amend her complaint.[6] The

[6] During the hearing on the defendant's motion to set aside the verdict, the court stated: "[P]ermitting this complaint, the amendment of this complaint, did not delay the trial, nor do I believe permitting this complaint work[ed] an injustice to the defendant.

"And I say that because it was clear throughout the whole case, from the moment the suit was brought, that this lady had sustained an injury, that this lady incurred medical costs as a result of the necessary care required to address those injuries, and that, in fact, there were medical bills. There was an intervening plaintiff in this case right up until the day of evidence. So, if there can be no surprise to the defendant that there were medical bills incurred, it cannot, I believe, be sustained that it worked an injustice.

"And I believe that the failure to address in the original complaint the medical bills was an omission made . . . perhaps because at the time those bills were being cared for by someone else, but if you look at the interrogatory responses which you provided me . . . the responses also make clear that the bills were paid by a workers' compensation carrier, and those responses are not inconsistent with other responses that went to collateral sources . . . ."

record shows that the defendant was put on notice because the claim for medical expenses added to the complaint was in the third party intervening complaint that had sought, before being withdrawn prior to trial, reimbursement for workers' compensation paid for the plaintiff.[7] In addition, the court stated that "it was clear throughout the whole case, from the moment the suit was brought, that [the plaintiff] had sustained an injury, that [she] incurred medical costs as a result of the necessary care required to address those injuries, and that, in fact, there were medical bills."

Regarding the defendant's argument that the amended complaint was untimely and unduly delayed the trial, we find the plaintiff's argument persuasive. The plaintiff argues that the amendment did not seek to add a new cause of action to the complaint. Rather, the amendment sought to add an additional specification of damages that should not have been a surprise to the defendant. The court also noted that the defendant knew or should have known throughout the course of the case that the plaintiff had sustained medical bills as a result of the defendant's alleged negligence.

Moreover, the plaintiff's claim for medical expenses was supported by the evidence. The plaintiff's responses to interrogatories indicated that her employer's workers' compensation carrier was paying her medical bills. Additionally, the plaintiff presented evidence at trial that, following surgery with the defendant, she underwent physical therapy, was treated by several physicians for her femoral nerve palsy and was in the care of a rehabilitation psychologist.

---

[7] The intervening complaint alleged in pertinent part: "As a result of these injuries, the intervening employer plaintiff has paid compensation to the employee plaintiff in the amount of $18,456.39 and may be required in the future to pay further sums, and in addition, has paid to or on behalf of the employee plaintiff the sum of $50,211.12 for medical care under the terms of the [Workers' Compensation Act, General Statutes § 31-275 et seq.], and may be required to furnish further such expenses in the future."

We conclude that it was within the court's discretion to allow the plaintiff to amend her complaint because the court found that permitting the amendment would not work an injustice to either the plaintiff or the defendant and that the granting of the motion would not unduly delay the trial. See *Martin Printing, Inc.* v. *Sone*, supra, 89 Conn. App. 342.

### III

The defendant claims that the court failed to instruct the jury properly as to the standard of care because the court did not give his proposed instruction, which would have charged the jury not to hold him to the standard of a health care provider who possessed "extraordinary learning and skill which belongs only to a few individuals of rare endowments," but to hold him to the standard of the "average" health care provider in his profession. Instead, the court charged the jury that in order to find the defendant liable, it was to apply the standard of a "reasonably prudent, similar health care [provider]." Thus, the defendant argues, he was improperly held to a higher standard of care than that required by applicable law. We disagree.

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quota-

tion marks omitted.) *DiStefano* v. *Milardo*, 276 Conn. 416, 421, 886 A.2d 415 (2005).

The "reasonably prudent" standard that was given by the court is set by statute and is supported by current case law. "[General Statutes § 52-184c] addresses the standard of care and the qualifications of testifying experts in medical malpractice actions. [The statute] sets forth four distinct, yet closely intertwined, subsections. Section 52-184c (a) requires the plaintiff to prove, by a preponderance of the evidence, that the defendant breached the prevailing professional standard of care for that health care provider. . . . That subsection then defines the prevailing professional standard of care for a given health care provider [as] that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers. . . . Subsections (b) and (c) of § 52-184c define a similar health care provider for purposes of the statute. Section 52-184c (d) identifies those health care providers who may testify as an expert in any action as: "(1) . . . a similar health care provider pursuant to subsection (b) or (c) of this section; or (2) . . . a . . . health care provider . . . [who] to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine." (Citation omitted; internal quotation marks omitted.) *Friedman* v. *Meriden Orthopaedic Group, P.C.*, 272 Conn. 57, 65, 861 A.2d 500 (2004). The court's charge, as given, was correct in law.

IV

The defendant's final claim is that the court improperly precluded his expert witness from testifying. We disagree.

"Practice Book § 13-4 (4), which governs the disclosure of experts, allows a court to preclude expert testimony if the proponent of the testimony has made a late disclosure of the expert and the late disclosure will cause undue prejudice to the moving party. . . . The moving party bears the burden of showing that it was prejudiced. . . . Practice Book § 13-4 (4) states in relevant part: [A]ny plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. . . . If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision, or if an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party. . . .

"The court's decision on whether to impose the sanction of excluding the expert's testimony . . . rests within the sound discretion of the court. . . . The action of the trial court is not to be disturbed unless it abused its legal discretion, and [i]n determining this the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *Cavallaro* v. *Hospital of*

*Saint Raphael,* 92 Conn. App. 59, 65–66, 882 A.2d 1254, cert. denied, 276 Conn. 926, 888 A.2d 93 (2005).

After a review of the record, we conclude that, pursuant to Practice Book § 13-4 (4), the court reasonably determined that the late disclosure of the defendant's expert would result in both undue prejudice to the plaintiff and undue interference with the orderly progress of trial. Although the defendant filed an initial disclosure of expert witness on January 23, 2004, more than two months prior to trial, that disclosure failed to comply with Practice Book § 13-4 (4) because it was lacking in the required information, and the disclosure then had to be revised. The disclosure was not filed properly until February 16, 2004, one week before jury selection was to begin, by which time it would have resulted in undue prejudice to the plaintiff and undue interference with the orderly progress of trial. The court reasonably found that permitting the use of the defendant's expert would have prevented the trial from going forward on March 23, 2004, and would have delayed it for another two years.[8] Moreover, considering the complexity of the case, the expert disclosure was filed, as the court stated, "far too late for the deposition to occur, for a transcript of that deposition to be made available . . . and for [the plaintiff's counsel] to have advised [the plaintiff's expert] . . . to prepare a response to those points raised by [the defendant's expert] . . . ." We conclude that it was well within the court's broad discretion to preclude the defendant's expert from testifying.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[8] The court explained that as the result of its trial docket schedule, a continuance would have interfered with other scheduled trials on the court's individual complex litigation calendar.