# EMBALMERS' SUPPLY COMPANY *v.* SALVATORE D. GIANNITTI ET AL.
## (AC 25829)

Flynn, C. J., and Bishop and Harper, Js.

22

Argued October 23, 2006—officially released August 7, 2007

*Anthony M. Modugno*, with whom, on the brief, was *Frank Modugno*, for the appellant-appellee (defendant Modugno, Modugno & Modugno, LLC).

*Louis Ciccarello*, for the appellee-appellant (plaintiff).

*Opinion*

HARPER, J. This is an action for vexatious litigation brought by the plaintiff, the Embalmers' Supply Company, against the defendants, the law firm of Modugno, Modugno & Modugno, LLC (law firm), and its former client, Salvatore D. Giannitti.[1] After trial, the jury returned a verdict in favor of the plaintiff. On appeal, the law firm claims that the trial court (1) lacked subject matter jurisdiction, (2) improperly denied three of its postjudgment motions, (3) improperly permitted the plaintiff to file a reply to its special defense at the beginning of trial, (4) improperly permitted Gary R. Khachian, the attorney representing Giannitti, to testify as part of the plaintiff's rebuttal case and (5) improperly instructed the jury on the issue of probable cause.[2] In its cross appeal, the plaintiff claims that the court improperly denied its motion for interest and attorney's fees pursuant to Practice Book § 17-18. With regard to the law firm's appeal, we affirm the judgment of the trial court. As to the plaintiff's cross appeal, we reverse the judgment in part.

[1] The plaintiff withdrew its claims against Giannitti on March 10, 2003.

[2] The law firm also argues that the court violated canon 2 (a) of the Code of Judicial Conduct by improperly "advis[ing] [the] plaintiff's attorney on how to proceed during trial." Because we conclude that this claim has not been preserved, and the law firm has not requested review under any doctrine by which this court may review unpreserved claims, we decline to address it. See *Perry* v. *State*, 94 Conn. App. 733, 741, 894 A.2d 367, cert. denied, 278 Conn. 915, 899 A.2d 621 (2006).

The present action is based on prior litigation involving a request by Giannitti to inspect and copy the plaintiff's accounting records pursuant to General Statutes § 33-946 (b) (shareholder litigation). Throughout the shareholder litigation, the law firm represented Giannitti, who owned several hundred shares of the plaintiff's class B stock.

The relevant facts are as follows: On May 15, 1998, the plaintiff held a special stockholders' meeting to discuss whether to repurchase all of its class B stock. At that time, the stockholders voted to reject the proposal. On June 22, 1998, R. Shawn Beck, president of the plaintiff, sent a letter to Giannitti, informing him that there would be another special stockholders' meeting on August 20, 1998. The purpose of the meeting would be to conduct a second vote on the proposal to repurchase all class B stock at $153.64 per share. According to the letter, the purchase price of $153.64 per share was based on a 1997 valuation report prepared at the plaintiff's behest. The letter concluded with the statement that in the event that the stockholders voted to approve the stock repurchase, "each stockholder will have thirty days from the meeting date to submit his or her shares to the corporation's attorney for payment. After the thirty days expire, the offer will be withdrawn."

That same day, June 22, 1998, the law firm sent a letter to the plaintiff on Giannitti's behalf, officially requesting permission to inspect the plaintiff's accounting records pursuant to § 33-946 (b) (2).[3] The letter represented that the purpose of the request was to verify the adequacy of the repurchase offer, as well as the accuracy of the

---

[3] General Statutes § 33-946 (b) provides in relevant part: "A shareholder of a corporation is entitled to inspect and copy . . . any of the following records of the corporation if the shareholder meets the requirements of subsection (c) of this section . . . (2) accounting records of the corporation . . . ."

1997 valuation report on which it was based. The letter also stated that "[t]his information will be used to evaluate [Giannitti's] interest in said corporation and will aid [him] in [his] decision as to whether or not to accept the company's offer."

A representative from the law firm and William Galasso, Giannitti's accountant, attended the August 20, 1998 special stockholders' meeting. The meeting concluded with an affirmative vote to repurchase all class B stock at $153.64 per share over the next thirty days. Despite the offer, Giannitti did not sell his stock back to the plaintiff during the thirty day period. By its terms, the repurchase offer expired on September 21, 1998.

In early 1999, Giannitti filed a complaint against the plaintiff, alleging that he had been wrongfully denied access to some of the documents specified in his June 22, 1998 request to inspect and copy records. Although the stock repurchase occurred several months earlier, the complaint alleged that the inspection "was necessary in order to properly evaluate the offer made by [the plaintiff] to purchase [Giannitti's] class B stock." On the basis of this allegation, Giannitti petitioned the court for a writ of mandamus, compelling production of all of the requested records pursuant to General Statutes § 33-948 (b),[4] as well as for an order requiring payment of costs and attorney's fees pursuant to § 33-948 (c).[5]

---

[4] General Statutes § 33-948 (b) provides in relevant part: "If a corporation does not within a reasonable time allow a shareholder to inspect and copy any other record, the shareholder who complies with subsections (b) and (c) of section 33-946 may apply to the superior court . . . for an order to permit inspection and copying of the records demanded. . . ."

[5] General Statutes § 33-948 (c) provides: "If the court orders inspection and copying of the records demanded, it shall also order the corporation to pay the shareholder's costs, including reasonable attorney's fees, incurred to obtain the order unless the corporation proves that it refused inspection in good faith because it had a reasonable basis for doubt about the right of the shareholder to inspect the records demanded."

On May 18, 1999, the court, *Mintz, J.*, determined that the offer to repurchase Giannitti's stock had expired and that consequently, there was no longer any reason to grant the relief requested in the complaint. Accordingly, Judge Mintz dismissed the case as moot. On appeal, this court affirmed the judgment of dismissal. See *Giannitti* v. *Embalmers' Supply Co.*, 61 Conn. App. 904, 763 A.2d 1096, cert. denied, 255 Conn. 941, 768 A.2d 949 (2001).

Thereafter, the plaintiff initiated the present action by complaint dated April 11, 2001. The complaint alleged that the defendants "commenced and prosecuted [the shareholder litigation] without probable cause in violation of [General Statutes] § 52-568 (1)" and that Giannitti evinced "a malicious intent unjustly to vex and trouble the plaintiff corporation, in violation of § 52-568 (2) . . . ."[6] The plaintiff requested double damages from the defendants pursuant to § 52-568 (1) and treble damages from Giannitti, specifically, pursuant to § 52-568 (2).

On February 25, 2003, the parties attended a court-ordered pretrial conference. Giannitti and his wife, Karin Giannitti, were present, along with their attorney, Khachian. The law firm, R. Shawn Beck and Beck's son were also in attendance.[7] After the pretrial conference, the Giannittis, the Becks and their attorneys met without the law firm. At that time, they executed a handwritten document embodying an agreement to settle the case against Salvatore Giannitti. R. Shawn Beck, acting

---

[6] General Statutes § 52-568 provides in relevant part: "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others . . . (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

[7] Throughout this litigation, the law firm was represented by two of its partners, Anthony M. Modugno and Frank Modugno.

on behalf of the plaintiff, also signed a generic release form (release) in which the plaintiff agreed to discharge the Giannittis and their "agents" from all past, present and future claims.[8]

Khachian later created a typed, formal copy of the February 25, 2003 agreement that was signed by the Giannittis and by R. Shawn Beck as a representative of the plaintiff (settlement agreement). In accordance with its terms, Salvatore Giannitti agreed to pay the plaintiff $2500 "as full and final satisfaction of the claims brought against him" in return for "full access to [the plaintiff's] books and records." The settlement agreement further recorded the plaintiff's and the Giannittis' "exchange [of] mutual releases." Pursuant to the agreement, Salvatore Giannitti was withdrawn from the present action on March 10, 2003.

One and one-half years later, the law firm and the plaintiff proceeded to trial. After deliberations, the jury returned a verdict in favor of the plaintiff on the basis of the finding that the law firm had instituted the shareholder litigation without probable cause and thereby caused the plaintiff to incur $7238.31 in damages. The jury further found that the provisions of the release did not absolve the law firm of liability for any action taken "as an agent of [its] former client Salvatore D. Giannitti

---

[8] The release stated in relevant part: "[The plaintiff], in consideration of the sum of ONE DOLLAR ($1.00) and other valuable considerations, received from THE RELEASEES, SALVATORE GIANNITTI and KARIN E. GIANNITTI . . . hereby release and discharge the said, SALVATORE GIANNITTI and KARIN GIANNITTI, as the RELEASEES, RELEASEES' agents . . . from all actions, causes of action, suits, debts . . . claims, and demands whatsoever . . . which against the RELEASEES or their agents . . . the RELEASORS . . . ever had, now have or hereafter can, shall, or may have . . . ."

Following this general language, the release stated: "It is the specific intention of this document to resolve all claims that the [plaintiff] may have against the Releasees relating to the incidents, as more fully detailed in a suit between the parties in the Connecticut Superior Court for the Judicial District of Stamford/Norwalk bearing docket number CV-010183763."

. . . ." Thereafter, the law firm filed five motions, including motions for remittitur, for a new trial and to set aside the verdict. All five were denied by the court.

The plaintiff filed a postjudgment motion entitled "motion for judgment in accordance with jury verdict and section 17-18 of the Practice Book." In accordance with Practice Book § 17-18,[9] the plaintiff asked the court to include in its final judgment $350 in attorney's fees and "interest from the date the complaint was filed to the date of judgment as provided by [Practice Book] § 17-18 . . . ." The court denied the plaintiff's motion after concluding that the plaintiff did not make a valid "offer of judgment" pursuant to General Statutes (Rev. to 2003) § 52-192a.[10] Section 52-192a is the statutory basis for Practice Book § 17-18.

[9] Practice Book (2002) § 17-18 provides in relevant part: "After trial the judicial authority shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the judicial authority ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in the plaintiff's 'offer of judgment,' the judicial authority shall add to the amount so recovered 12 percent annual interest on said amount, computed as provided in General Statutes § 52-192a, may award reasonable attorney's fees in an amount not to exceed $350, and shall render judgment accordingly. . . ."

[10] General Statutes (Rev. to 2003) § 52-192a (a) provides in relevant part: "After commencement of any civil action . . . seeking the recovery of money damages . . . the plaintiff may . . . file with the clerk of the court a written 'offer of judgment' . . . directed to the defendant . . . offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain . . . . Within sixty days after being notified of the filing of the 'offer of judgment' and prior to the rendering of a verdict by the jury . . . the defendant . . . may file with the clerk of the court a written 'acceptance of offer of judgment' agreeing to a stipulation for judgment as contained in plaintiff's "offer of judgment". . . . If the 'offer of judgment' is not accepted within sixty days and prior to the rendering of a verdict by the jury . . . the 'offer of judgment' shall be considered rejected and not subject to acceptance unless refiled. . . ."

Section 52-192a was amended by Public Acts 2001, No. 01-71, § 1, effective October 1, 2001, to increase from thirty to sixty days the time within which to accept an offer of judgment. For convenience, we refer to the 2003 revision of the statute, which codified the 2001 amendment.

In its memorandum of decision, the court doubled the plaintiff's damages pursuant to § 52-568 (1) and rendered judgment against the law firm in the amount of §14,476.62. The law firm timely appealed from the judgment, and the plaintiff cross appealed, challenging the court's denial of its motion for interest and attorney's fees under Practice Book § 17-18.

I

THE LAW FIRM'S APPEAL

In its appeal, the law firm raises various grounds for reversing the judgment of the court. We address each argument in turn.

A

Subject Matter Jurisdiction

Before turning to the merits of the law firm's appeal, we must first address its claim that this court lacks subject matter jurisdiction. Specifically, the law firm claims that the trial court dismissed the action for lack of subject matter jurisdiction on October 21, 2002. "[B]ecause [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary. . . . Moreover, [i]t is a fundamental rule that a court may raise and review the issue of subject matter jurisdiction at any time." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 532–33, 911 A.2d 712 (2006).

There is an initial question, however, about whether the court ever in fact dismissed the case for lack of subject matter jurisdiction. On September 4, 2002, the law firm filed a motion requesting dismissal of the case because the plaintiff's complaint, as amended, did not comply with the pleading requirements of General Statutes § 52-91 and Practice Book § 10-20. On October 21, 2002, the court, *Adams, J.*, entered an order stating that

the motion was "[g]ranted to [the] extent [that] the plaintiff will file [an] amended pleading includ[ing] [substantive counts and substantive relief] within [the] next [ten] days." The plaintiff filed an amended complaint and demand for relief on October 31, 2002.

Despite the plaintiff's timely filing of an amended pleading, the law firm argued in subsequent motions and pleadings that the October 21, 2002 order constituted a dismissal of the case. First, the law firm filed an objection to the plaintiff's amended complaint and demand for relief on the ground that the court's October 21, 2002 order dismissed the case for want of subject matter jurisdiction. On February 25, 2003, the court, *Adams, J.*, overruled the law firm's objection and wrote that "the defendant law firm is ordered to file and serve an answer [to the amended complaint] within fifteen days." After the law firm requested that the court "articulate and clarify" its reasoning, Judge Adams wrote that the "[c]ourt will adhere to previous decisions; defendant to file answer and case is not dismissed." (Internal quotation marks omitted.)

On March 11, 2003, the law firm filed a motion to dismiss that again alleged that the October 21, 2002, order constituted a dismissal for lack of subject matter jurisdiction. On August 27, 2003, the court, *Hon. William B. Lewis*, judge trial referee, issued a memorandum of decision denying the motion. The court flatly stated that "[t]he claim that Judge Adams dismissed this action is erroneous," and opined that the October 21, 2002 order merely connoted a desire for "a complete complaint with both allegations of fact and prayers for relief in one document." As further confirmation of his understanding of the order, the court cited Judge Adams' "clear and explicit ruling" that the "case is not dismissed."

Thereafter, the law firm filed an answer in which it raised as a special defense the allegation that the October 21, 2002 "dismissal" of the case divested the court of subject matter jurisdiction. The plaintiff promptly filed a motion to strike that special defense, which the court, *Radcliffe, J.*, granted on January 20, 2004.

On December 12, 2003, the law firm filed an amended motion for summary judgment that raised, yet again, the allegation that the court lacked subject matter jurisdiction because of Judge Adams' "dismissal" of the case on October 21, 2002.[11] In a memorandum of decision dated February 27, 2004, the court, *Tobin, J.*, rejected the claim and wrote that "[t]he fact that four judges have now been required to consider this same specious claim can not be allowed to pass without comment. Having had this claim repeatedly and explicitly rejected, it is nearly inconceivable . . . that a member of the bar of this state would file a motion for summary judgment [on the same grounds]." The court then reminded the law firm and its members that although they were proceeding pro se, they were still subject to the Rules of Professional Conduct. The court concluded by stating that the law firm is "hereby expressly cautioned that no further frivolous pleadings . . . will be tolerated by the court."

Finally, in the August 18, 2004 hearing on the parties' postjudgment motions, the law firm asked the court to reconsider its ruling that the October 21, 2002 order did not dismiss the case. The court stated: "I think I ruled once and for all and indeed even suggested that it would be a proper matter for the [statewide] grievance committee if it were raised again." The court further lamented that the law firm's claim of dismissal had been "raised so often and . . . is so lacking in merit."

---

[11] It is also worth noting that in an order dated February 2, 2004, the court, *Hiller, J.*, warned the law firm "not to raise the prior issue of dismissal by Judge Adams and Judge Lewis except by appeal."

The previously mentioned rulings, as well as the record itself, make it plain that the law firm's argument is contrary to the facts of this case. It is evident from the record that the October 21, 2002 order to dismiss the case was conditioned on the plaintiff's failure to file an amended pleading. The condition never occurred because the plaintiff filed the requisite pleading within the specified time frame. Furthermore, the judge who entered the October 21, 2002 order clarified any lingering confusion by stating that he did not dismiss the case.

Because the case was never dismissed, there is no merit to the law firm's argument that the trial court, and therefore this court, lacks subject matter jurisdiction. Accordingly, we now address the merits of the law firm's appeal.

B

Improper Denial of Motion To Set Aside the Verdict

In its motion to set aside the verdict, the law firm argued that as a matter of law (1) it had probable cause to initiate the underlying action and (2) the release discharged it of any and all liability to the plaintiff. After a hearing, the court denied the motion.

On appeal, the law firm claims that the court improperly rejected both grounds for granting the motion. The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal

principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Jackson* v. *Water Pollution Control Authority*, 278 Conn. 692, 702, 900 A.2d 498 (2006).

1

## Lack of Probable Cause For Instituting the Shareholder Litigation

The law firm begins by waging a multipronged attack on the court's finding that it lacked probable cause to initiate the underlying action.[12] Specifically, the law firm contends that the court's finding as to the issue of probable cause was unsupported by the evidence submitted at trial.[13]

As stated previously, we review a court's denial of a motion to set aside the verdict under the abuse of discretion standard. See id. Having set forth the applicable standard of review, we now turn to the essential elements of a vexatious litigation claim under § 52-568.

[12] We find no merit to the law firm's claim that the court improperly failed to rule on the issue of probable cause. In that regard, we call attention to the court's comments during the August 18, 2004 hearing on the law firm's five postjudgment motions. In its motion to set aside the verdict, the law firm requested a new trial on the ground that there was insufficient evidence to support a finding that it lacked probable cause. After listening to extended argument by the law firm on that specific part of the motion, the court stated: "I do not find a sufficient basis for setting aside the jury finding of lack of probable cause. It was . . . without probable cause. I'm sorry. All right."

[13] The law firm also claims that the first jury interrogatory evinces an unsubstantiated factual finding that the law firm brought the underlying action "in its individual capacity." Our examination of the record reveals no such finding by the jury. The first interrogatory asked whether the plaintiff proved that the law firm "instituted" the underlying litigation. By answering the question in the affirmative, the jury did not thereby find that the law firm did so "in its individual capacity." On the contrary, whether a lawsuit was instituted, and on whose behalf a lawsuit was instituted, are entirely separate questions.

"To establish [a claim of vexatious litigation under the common law], it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor." (Internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94, 912 A.2d 1019 (2007). "A statutory action for vexatious litigation under . . . § 52-568 . . . differs from a common-law action only in that a finding of malice is not an essential element, but will serve as a basis for higher damages." (Citation omitted.) Id.

"[F]or purposes of a vexatious suit action, [t]he legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable [person] in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of. . . . Thus, in the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity of the claim asserted." (Internal quotation marks omitted.) Id., 100–101. Finally, the existence of probable cause "is an absolute protection against an action for [vexatious litigation], and what facts, and whether particular facts, constitute probable cause is always a question of law." (Internal quotation marks omitted.) Id., 94.

Our Supreme Court recently had the opportunity to consider whether a higher legal standard of probable cause should be applied to attorneys and law firms sued for vexatious litigation. See id., 84. After considering the statute and the competing policy interests, the court concluded that a higher standard should not apply. Id.,

100. Instead, in assessing probable cause, the court phrased the critical question as whether "on the basis of the facts known by the law firm, a reasonable attorney familiar with Connecticut law would believe" he or she had probable cause to bring the lawsuit. Id., 104–105. As is implied by its phrasing, the standard is an objective one that is necessarily dependent on what the attorney knew when he or she initiated the lawsuit. Id., 98. Further, the court warned that "[p]robable cause may be present even where a suit lacks merit. Favorable termination of the suit often establishes lack of merit, yet the plaintiff in [vexatious litigation] must *separately* show lack of probable cause." (Emphasis in original; internal quotation marks omitted.) Id., 103.

"Whether the facts are sufficient to establish the lack of probable cause is a question ultimately to be determined by the court, but when the facts themselves are disputed, the court may submit the issue of probable cause in the first instance to a jury as a mixed question of fact and law." *DeLaurentis* v. *New Haven*, 220 Conn. 225, 252–53, 597 A.2d 807 (1991). In this case, the jury found by way of an interrogatory that the law firm instituted the shareholder litigation without probable cause. After trial, the law firm filed a motion to set aside the verdict, alleging, inter alia, that the jury's findings were "against the evidence." After reviewing the evidence, the court denied the law firm's motion and concluded further that the law firm lacked probable cause as a matter of law.

Resolving the question of probable cause, then, requires us to determine (1) the facts known to the law firm at the time that it filed suit pursuant to § 33-946 and (2) whether, with knowledge of those facts, a reasonable attorney familiar with Connecticut law would believe that he or she had probable cause to bring suit under § 33-946. At trial, the plaintiff called Frank Modugno, one of the partners in the law firm, to testify

about what the law firm knew at the time it instituted the shareholder litigation. His testimony, which was undisputed, established the law firm's knowledge of the following facts: (1) Salvatore Giannitti owned several hundred shares of class B stock in the plaintiff corporation; (2) in June, 1998, the law firm sent a letter on Salvatore Giannitti's behalf requesting access to the plaintiff's accounting records; (3) in July, 1998, the plaintiff permitted Salvatore Giannitti's accountant to inspect some, but not all, of the records named in the written request; (4) in August, 1998, the plaintiff held a special stockholder's meeting at which the stockholders voted to repurchase class B shares at $ 153.64 per share; (5) the deadline to take advantage of the repurchase offer was September 21, 1998; and (6) Salvatore Giannitti did not avail himself of the repurchase offer before it expired on September 21, 1998.

On the basis of the previously stated facts, the defendants requested a court order pursuant to § 33-948 (b) enforcing Salvatore Giannitti's right to inspect and copy the plaintiff's records. Yet, the receipt of a court order under § 33-948 (b) is expressly conditioned on compliance with § 33-946 (c), which provides: "A shareholder may inspect and copy the records described in [§ 33-946 (b)] only if: (1) His demand is made in good faith and for a proper purpose; (2) he describes with reasonable particularity his purpose and the records he desires to inspect; and (3) the records are directly connected with his purpose." General Statutes § 33-946 (c).

Judge Mintz dismissed the shareholder litigation as moot because he concluded that Salvatore Giannitti did not have "a proper purpose" within the meaning of § 33-946 (c) (1) after the stock repurchase offer expired. In reaching that decision, Judge Mintz expressly relied on the complaint's allegation that the inspection was necessary "in order to properly evaluate the offer made by the [plaintiff] to purchase [the stock]."

The court, *Tobin, J.*, accepted the findings of the jury and of Judge Mintz in the shareholder litigation that the defendants' sole reason for wanting to conduct the inspection was to evaluate the stock repurchase offer.[14] The court then concluded that the law firm lacked probable cause, as a matter of law, because "the offer had expired at the time [it] brought the lawsuit and [it] brought the lawsuit only for the stated purpose of pursuing that offer."

The heart of the probable cause inquiry, therefore, is whether a reasonable attorney familiar with Connecticut law would believe that evaluating an expired stock repurchase offer constitutes "a proper purpose" for requesting inspection of a corporation's documents. In *Pagett* v. *Westport Precision, Inc.*, 82 Conn. App. 526, 845 A.2d 455 (2004), this court was called on to interpret, for the first time, the meaning of the requirement in § 33-946 (c) that a shareholder's demand be made with "a proper purpose." We began with the common-law definition of "proper purpose," described as "a lawful and reasonable purpose germane to [the shareholder's] status as a shareholder . . . ." (Internal quotation marks omitted.) Id., 532. We then noted that "[a] purpose will be found to be improper if it is for speculative or trading purposes or for any purpose inimical to the interest of the corporation or of its shareholders." (Internal quotation marks omitted.) Id.

For further guidance, we also examined the official comment to § 16.02 (c) the Model Business Corporation

[14] The law firm attempts to challenge this finding by citing the fact that its June 22, 1998 letter to the plaintiff gave two other reasons for requesting the inspection: (1) to evaluate the 1997 valuation report on which the plaintiff based the purchase price of $153.64 per share and (2) to evaluate Salvatore Giannitti's interest in the company. We must reject the law firm's invitation to reweigh the evidence and note that "[o]nce again, this court is compelled to state, what has become a tired refrain, we do not retry the facts . . . ." *Bowman* v. *Williams*, 5 Conn. App. 235, 238, 497 A.2d 1015 (1985), appeal dismissed, 201 Conn. 366, 516 A.2d 1351 (1986).

Act (model act), which provided the blueprint for § 33-946 (c). Id., 533. The official comment to that section of the model act makes the following observations about the usage of the phrase "a proper purpose": "A proper purpose means a purpose that is reasonably relevant to the demanding shareholder's interest as a shareholder. . . . As a practical matter, a shareholder who alleges a purpose in general terms, such as a desire to determine the value of his shares, to communicate with fellow shareholders, or to determine whether improper transactions have occurred, has been held to allege a proper purpose." (Internal quotation marks omitted.) Id., 533–34.

Taking heed of those traditional definitions of probable cause, we turn to the facts of this case. The defendants' purpose, as stated in their complaint and as found by the court, was "to properly evaluate the offer made by the [plaintiff] to purchase [the stock]." The law firm contends that it had probable cause, as a matter of law, because "[it] followed the statutes and proceeded as any attorney would have under the same circumstances." The law firm also argues, as it did before the trial court, that it could "evaluate" the repurchase offer even after its expiration.

The law firm's contention that it "followed the statutes" is irrelevant for purposes of liability for vexatious litigation. Although it is undisputed that the law firm filed a complaint pursuant to § 33-948 (b), the plaintiff alleged vexatious litigation on the ground that the law firm did so *without probable cause.* As such, the critical question is not whether the law firm actually believed that it had a proper purpose, but whether it had *probable cause* to believe its stated purpose was proper.

Furthermore, the jury and the court implicitly rejected the law firm's contention that it "proceeded

as any attorney would have under the same circumstances." A finding that the law firm instituted the shareholder litigation without probable cause necessarily connotes a finding that the law firm did not proceed "as any attorney would have under the same circumstances."

Turning to the law firm's argument concerning its use of the word "evaluate," we agree that one could want to evaluate the adequacy of an offer independent of his or her interest in accepting it. Yet, the phrase "proper purpose," as used in § 33-946 (c) has never been understood to mean any conceivable purpose. As stated previously, a purpose, to be "proper," must be "lawful and reasonable," as well as germane to the shareholder's interest as a shareholder.

Obviously, evaluating the adequacy of an *open* offer to repurchase stock is "germane" to a shareholder's interest as a shareholder and therefore a proper purpose within the meaning of § 33-948 (c). Yet, the law firm has not explained how its evaluation of the *expired* stock repurchase offer similarly could constitute a "proper purpose." As a practical matter, it would be difficult, if not impossible, for the law firm to make that claim. After the repurchase offer expired, any subsequent "evaluation" of the offer would be unrelated to any acceptance or rejection thereof. The law firm's purported "evaluation" of the expired offer, therefore, could never have satisfied the requirement of § 33-946 (c) that the demand for inspection be made "in good faith and for a proper purpose . . . ." General Statutes § 33-946 (c).

This court has previously held that conducting a general valuation of stock in a closely held corporation is a "proper purpose" within the meaning of § 33-946 (c). See *Pagett* v. *Westport Precision, Inc.*, supra, 82 Conn. App. 536. Here, however, the law firm was not seeking

to ascertain the value of Salvatore Giannitti's stock. Its purpose, as alleged in the complaint and found by the court, was to "properly evaluate the offer made by [the plaintiff] . . . ." Given its stated reason for wanting the inspection, the court was justified in concluding that the law firm did not have a "proper purpose" when it filed suit in the shareholder litigation. Moreover, the law firm has never provided a coherent explanation of how it planned to "evaluate" an offer that no longer existed.

We conclude that a reasonable attorney would not believe that evaluating the expired offer was "a lawful and reasonable purpose germane to [the shareholder's] status as a shareholder . . . ." (Internal quotation marks omitted.) *Pagett* v. *Westport Precision, Inc.*, supra, 82 Conn. App. 532. Because a reasonable attorney familiar with Connecticut law would not believe that evaluating an expired stock repurchase offer constitutes "a proper purpose" for requesting inspection of corporate records, we conclude that the law firm did not, as a matter of law, have probable cause to bring suit in the shareholder litigation. Accordingly, the court did not abuse its discretion in denying the motion to set aside the verdict on this ground.[15]

2

Effect of the Release

With regard to the denial of its motion to set aside the verdict, the law firm also claims that the court improperly rejected its argument that the release discharged it of any liability to the plaintiff. Specifically, the

---

[15] In reaching this conclusion, we reject the law firm's related claim that the plaintiff failed to establish through expert testimony "the standard of care of an attorney in instituting a lawsuit and how that standard of care was not met." The law firm cites no cases that substantiate the supposed need for expert testimony in vexatious litigation actions against attorneys, and we are unaware of any.

law firm argues that because it was Salvatore Giannitti's "agent," it thereby was covered by the release provision discharging Salvatore Giannitti's "agents" of liability to the plaintiff. The law firm further contends that the release was unambiguous and that the court's admission of parol evidence concerning the intent of its signatories was therefore improper.[16] We are not persuaded.

Additional facts are necessary to our resolution of the law firm's claim. The court set forth two reasons for its rejection of the law firm's argument that it was Salvatore Giannitti's "agent" in the underlying action and thereby covered under the terms of the release. First, the court noted that the case was not premised on any claim of derivative liability. Instead, the plaintiff was alleging that the law firm was directly liable under § 52-568 for its prosecution of the underlying action.

Second, the court cited *Sims* v. *Honda Motor Co.*, 225 Conn. 401, 623 A.2d 995 (1993), for the proposition that even when a release is unambiguous, parol evidence is admissible to show its intended scope and

---

[16] The law firm also claims that the court never determined whether the release was ambiguous. To the contrary, the court's statements during trial and in its February 27, 2004, memorandum of decision evince an implicit finding of ambiguity. See footnote 17. Notably, the court stated that it would allow the plaintiff to present evidence concerning the parties' intent in executing the release "to show, *to construe the ambiguity,* when [the law firm] is not named in the release, to show what the intent of the document was." (Emphasis added.) The court later explained that parol evidence was admissible because the law firm was "pleading the benefit of the general release, *that is, it is ambiguous on its face* . . . ." (Emphasis added.)

Furthermore, contrary to the law firm's suggestion, the court did not have to use the buzzword "hold" in order to convey its belief that the release was ambiguous. "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." (Internal quotation marks omitted.) *Aurora* v. *Miami Plumbing & Heating, Inc.*, 6 Conn. App. 45, 46, 502 A.2d 952 (1986). Here, the court's repeated references to the ambiguity of the release were more than sufficient to convey its belief in that fact.

effect.[17] Consistent with this reading of *Sims*, the court examined the extrinsic evidence concerning intent and found that the parties never intended to discharge the law firm from its potential liability to the plaintiff. Further, the court found evidence that the law firm was aware of its intentional exclusion from the coverage of the release. Because the plaintiff and Salvatore Giannitti did not intend to discharge the law firm from liability at the time that they executed the release, the court held that the release had not done so as a matter of law.

As stated previously, we review the denial of a motion to set aside the judgment under the deferential abuse of discretion standard.[18] See *Jackson* v. *Water Pollution Control Authority*, supra, 278 Conn. 702. Beyond that standard of review, determining whether the release effectually discharged the law firm of liability requires us to interpret its language. "It is well settled that a release, being a contract whereby a party abandons a claim to a person against whom that claim exists, is subject to rules governing the construction of contracts. . . . The intention of the parties, therefore, controls the scope and effect of the release, and this intent is discerned from the language used and the circumstances of the transaction." (Internal quotation marks

---

[17] Although it held that evidence of the parties' intent was admissible even in the absence of ambiguity, the court nevertheless strongly implied that the release was ambiguous. See footnote 16. Specifically, the court stated in a footnote: "It is obvious that a properly drafted release could have avoided [the law firm's] claim. A careful draftsman would have included in the document a statement that expressly excluded [the law firm] from the benefits of the release."

[18] The law firm addressed this issue of law in a generic manner and thereby failed to identify the particular ruling from which it appeals. Nevertheless, our search of the record shows that the court rejected this claim twice— once in the memorandum of decision denying the law firm's amended motion for summary judgment and once during the hearing on the law firm's motion to set aside the verdict. Because the law firm has appealed from the denial of its motion to set aside the verdict, we will use the standard of review applicable to rulings on such motions to adjudge the court's treatment of the issue of the release.

omitted.) *Muldoon* v. *Homestead Insulation Co.*, 231 Conn. 469, 482, 650 A.2d 1240 (1994).

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000). Further, "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Pesino* v. *Atlantic Bank of New York*, 244 Conn. 85, 92, 709 A.2d 540 (1998).

Accordingly, we turn to the two reasons for the court's rejection of the law firm's argument that the release discharged it of liability to the plaintiff. We agree with the court that the plaintiff's action against the law firm was founded on an allegation of direct liability for the institution of the underlying litigation. Since *Vandersluis* v. *Weil*, 176 Conn. 353, 407 A.2d 982 (1978), our Supreme Court has "assumed, without discussion, that an attorney may be sued in an action for vexatious litigation, arguably because that cause of action has built-in restraints that minimize the risk of inappropriate litigation." *Mozzochi* v. *Beck*, 204 Conn. 490, 495, 529 A.2d 171 (1987). Indeed, just this year, our Supreme Court articulated the standard of probable cause that is applicable to vexatious litigation suits brought against attorneys. See *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 281 Conn. 84. There is therefore no basis for the law firm's argument that by virtue

of its status as a law firm, it cannot be held directly liable for vexatious litigation under § 52-568.

We depart from the court's decision insofar as it purports to rely on *Sims* v. *Honda Motor Co.*, supra, 225 Conn. 401, for the proposition that a court need not make a finding of ambiguity before admitting extrinsic evidence of the parties' intent in executing a release. A review of *Sims* and subsequent decisions reveals that the rule set forth in that case applies only in situations in which the normal rules of contract interpretation would operate to defeat the purpose of a remedial statute such as General Statutes § 52-572e.

In *Sims*, the plaintiff brought a product liability action against the manufacturer of a motorcycle that he was driving at the time he was involved in a collision with an automobile. See *Sims* v. *Honda Motor Co.*, supra, 225 Conn. 402–403. The manufacturer moved for summary judgment on the ground that a release signed by the plaintiff and the other driver's insurance company discharged the manufacturer of liability as a matter of law. Id., 405.

The key issue in the case was the proper construction of § 52-572e,[19] specifically, whether a tortfeasor must be specifically named in a release in order to be discharged of liability thereby. Id., 405–406. Ultimately, our Supreme Court held that "[u]nder § 52-572e . . . the contracting parties' intent, not the operation of a legal rule [of contract interpretation], determines the scope of a release." (Emphasis added.) Id., 413. Accordingly, when applying § 52-572e "[a] trial court may consider extrinsic evidence of the parties' intent regarding the scope of the release regardless of whether the court

---

[19] General Statutes § 52-572e (b) provides in relevant part: "A release by the injured person, or his legal representative, of one joint tortfeasor does not discharge the other tortfeasors unless, and only to the extent, the release so provides."

determines that the language of the release is ambiguous." Id., 419.

Our Supreme Court reasoned that it was necessary to create a special "intent rule" of contract interpretation for § 52-572e in order to avoid frustrating the goal of that statutory provision. The court observed: "By abrogating the common law rule that a release of one joint tortfeasor discharges, by operation of law, all joint tortfeasors, § 52-572e preserves the right of the injured party to choose to release one or all joint tortfeasors in accordance with the intent of the negotiations between the injured party and the settling tortfeasor." Id., 413; see also *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 719, 735 A.2d 306 (1999) ("the intent of the legislature in enacting § 52-572e was to enable an injured party to secure payment of damages from one tortfeasor while maintaining the right to proceed against other tortfeasors who remain independently at fault *for their own wrongful acts that contributed to the injury*" [emphasis in original]).

That our Supreme Court did not intend for the rule in *Sims* to apply to all releases became apparent in its later decisions. Two years after *Sims*, our Supreme Court clarified that *Sims* should not be read as a rejection of the "four corners" doctrine of contract interpretation. See *Levine* v. *Massey*, 232 Conn. 272, 278 n.7, 654 A.2d 737 (1995). Instead, the court described it as "a narrow exception to the general rule of contract construction" that was needed to avoid "frustrat[ing] the purpose of a remedial statute." Id.

That is clearly not the situation in this case. Section 52-568 is not a statute that was enacted to overturn a common-law rule of liability or to ameliorate the harshness of any results produced thereby. On the contrary,

§ 52-568 represents a statutory codification of the common-law cause of action for vexatious litigation.

Moreover, despite being invited to expand the applicability of the *Sims* exception, our Supreme Court has repeatedly declined to do so. In 1999, it confined § 52-572e and the *Sims* "intent rule" to situations involving joint tortfeasors. *Alvarez* v. *New Haven Register, Inc.,* supra, 249 Conn. 709. Later, in *Cunha* v. *Colon,* 260 Conn. 15, 17, 792 A.2d 832 (2002), our Supreme Court narrowly construed the phrase "joint tortfeasor" and concluded that the lessor and lessee of a motor vehicle were not joint tortfeasors within the meaning of § 52-572e.

Every indication from our Supreme Court suggests that the *Sims* exception is a narrow one and should certainly not be expanded beyond the circumstances that spawned its creation. We therefore conclude that *Sims* is inapplicable. Consequently, we will apply the normal principles of contract interpretation.[20]

An examination of the release in this case reveals that its use of the term "agents" is ambiguous. One could reasonably argue that the term "agents" includes the law firm to the extent that it acted as Salvatore Giannitti's former attorney. More importantly, the release is silent about whether the law firm was intended to be included or excluded from its coverage.

[20] In light of our conclusion that *Sims* is inapplicable to this case, we do not need to engage in a thorough analysis of the law firm's claim that the court improperly instructed the jury on the legal effect of the release. The law firm argues that the court's instruction improperly implied that "[it] was a joint tortfeasor or that . . . General Statutes § 52-572e [applied] or that the release was ambiguous." Yet, our review of the court's instruction reveals no such impropriety. Further, the court was entirely correct in instructing the jury "to determine whether it was the intent of the plaintiff to release [the law firm] as well as the Giannittis."

Given the failure of the release to define the term "agents" or otherwise indicate that it was solely applicable to the Giannittis, we conclude that extrinsic evidence was necessary and, therefore, admissible to establish the intent of the parties at the time of its execution. Accordingly, the court properly allowed both parties to present extrinsic evidence that tended to clarify the intended scope and coverage of the release.

The interpretation of ambiguous contract language, being a question of fact, was properly submitted to the jury through an interrogatory. On the basis of the evidence, the jury found that the law firm was not Salvatore Giannitti's "agent" within the meaning of the release. The law firm has not challenged that factual finding on appeal, and we decline to upset it because it was amply supported by the evidence presented at trial.

After hearing all of the evidence concerning the execution of the release, the jury found that the parties did not intend, through the use of the term "agents," to discharge the law firm of liability to the plaintiff. Because the intent of the parties governs the legal construction of a release; see *Muldoon* v. *Homestead Insulation Co.*, supra, 231 Conn. 482; we conclude, as a matter of law, that the release did not relieve the law firm of liability to the plaintiff for vexatious litigation under § 52-568. As such, the court did not abuse its discretion in denying the motion to set aside the verdict on this ground.

C

Improper Denial of Motion For a New Trial

In its motion for a new trial, the law firm argued that the amended complaint failed to allege a cause of action for vexatious litigation sufficiently under § 52-568. Further, the law firm contended that it was entitled to a new trial on the basis of (1) its failure to present evidence

establishing a relationship between JEB Industries, Inc., and Richard Beck, chairman of the plaintiff, and (2) Richard Beck's false testimony in connection therewith. After a hearing, the court denied the law firm's motion for a new trial.

The law firm claims that the court's refusal to grant a new trial on any of these grounds was improper. "Any motion for a new trial is addressed to the sound discretion of the trial court and will not be granted except on substantial grounds." *Burr* v. *Lichtenheim*, 190 Conn. 351, 355, 460 A.2d 1290 (1983). Yet notwithstanding this deferential standard of review, "[t]he interpretation of pleadings is always a question of law for the court . . . . The modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and to do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Citations omitted; internal quotation marks omitted.) *Travelers Ins. Co.* v. *Namerow*, 261 Conn. 784, 795, 807 A.2d 467 (2002).

1

### Inadequacy of the Complaint

First, the law firm challenges the court's rejection of its argument that the amended complaint failed to include sufficient allegations to state a cause of action for vexatious litigation under § 52-568. Specifically, in its motion for a new trial the law firm highlighted the complaint's failure to specifically allege that the law

firm initiated the underlying action "in [its] own name or the name of others . . . ." (Internal quotation marks omitted.) Additionally, the law firm argued that the complaint failed to specify "what [the law firm] knew at the time the prior underlying lawsuit was commenced and in what manner [the law firm] lacked probable cause."

The complaint, as amended, alleged that the defendant "instituted" the shareholder litigation and that Judge Mintz dismissed the case. The complaint then stated that the defendants unsuccessfully appealed to this court and then to our Supreme Court. Finally, the complaint alleged that "[the shareholder litigation], as well as the subsequent appeal and [p]etition [f]or [c]ertification, were all commenced and prosecuted without probable cause in violation of § 52-568 (1) . . . ."

All of those allegations, in the aggregate, were more than sufficient to put the law firm on notice of "the facts claimed and the issues to be tried . . . ." (Internal quotation marks omitted.) *Travelers Ins. Co.* v. *Namerow,* supra, 261 Conn. 795. Furthermore, the statutory cause of action for vexatious litigation requires a party to prove only "want of probable cause . . . and a termination of suit in the plaintiff's favor." *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP,* supra, 281 Conn. 94. Here, the complaint expressly alleged the existence of both elements.

"Our Supreme Court has repeatedly eschewed applying the law in such a hypertechnical manner so as to elevate form over substance." (Internal quotation marks omitted.) *Martin Printing, Inc.* v. *Sone,* 89 Conn. App. 336, 344, 873 A.2d 232 (2005). In accordance with that principle, it has consistently refused to require use of particular statutory buzzwords or phrases in complaints or otherwise to demand more specificity than necessary to give the other party notice of the

claims at issue. See *Stafford Higgins Industries, Inc.*
v. *Norwalk,* 245 Conn. 551, 575, 715 A.2d 46 (2002);
*Service Road Corp.* v. *Quinn,* 241 Conn. 630, 636, 698
A.2d 258 (1997); *Tedesco* v. *Stamford,* 215 Conn. 450,
459, 576 A.2d 1273 (1990), on remand, 24 Conn. App.
377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d
574 (1992).

Furthermore, "[t]he absence of a requisite allegation
in a complaint . . . is not a sufficient basis for vacating
a judgment unless the pleading defect has resulted in
prejudice. . . . [J]udgment will not be arrested for
faults in statement when facts sufficient to support the
judgment have been substantially put in issue and
found." (Internal quotation marks omitted.) *Tedesco* v.
*Stamford,* supra, 215 Conn. 457. The law firm has never
claimed that prejudice or surprise resulted from the
complaint's alleged lack of specificity. Consequently,
we conclude that it is not entitled to a new trial on
this ground.

2

"Newly Discovered Evidence" and Allegedly False
Testimony

Second, the law firm claims that the court should
have granted its motion for a new trial on the basis
of (1) its failure to present evidence establishing the
existence of a relationship between JEB industries, Inc.,
and Richard Beck, chairman of the plaintiff, and (2)
Richard Beck's false testimony in connection there-
with.[21] We disagree.

---

[21] The law firm further claims that a new trial was warranted because (1)
the court improperly admitted evidence concerning (a) the parties' settle-
ment negotiations and (b) their intent in executing the settlement agreement,
and (2) the plaintiff failed to specifically state in its complaint that the law
firm instituted the underlying action "in the name of others . . . ." (Internal
quotation marks omitted.) Because we already have concluded that these
arguments have no merit, we need not consider whether they could have
furnished a basis for granting a new trial.

Additional facts are necessary to our resolution of the law firm's claim. During cross-examination, the law firm asked Richard Beck whether he "ha[d] any personal relationship to JEB Industries, Inc.," and whether "any of [his] family members ha[d] any relationship to JEB Industries, Inc." He responded to both questions in the negative. He did testify, however, that JEB Industries, Inc., was a manufacturer of funeral supplies and that he believed it was located in Indiana.

At the hearing on the motion for a new trial, the law firm presented certified copies of the 1999 annual report of JEB Industries, Inc., as well as its certificate of dissolution, which it filed with the Delaware secretary of the state on December 18, 2000. In contradiction to Richard Beck's testimony, the documents showed that the individuals named as officers of JEB Industries, Inc., included Richard Beck himself, as well as his immediate family members. The law firm represented to the court that it obtained the documents after trial and that, accordingly, the action should be tried anew in order to afford it the opportunity to use this evidence to impeach Richard Beck. The law firm did not explain, however, why it came to possess this information only after the trial.

The court refused to grant a new trial because the 1999 annual report of JEB Industries, Inc., as well as its certificate of dissolution, were matters of public record and, therefore, easily accessible to the law firm. As such, the court concluded that the absence of this evidence at the time of trial was the result of the law firm's failure to "do [its] homework" and "prepare a cross-examination." In addition, the court found that granting a new trial because of a failure to uncover readily available evidence would constitute an impermissible "do over" and inexplicably permit the law firm "to get a second bite on this cause of action."

The court was similarly unimpressed by the law firm's argument that it was entitled to a new trial because of Richard Beck's allegedly false testimony concerning the lack of any connection between himself and JEB Industries, Inc. The court observed that the law firm should have been ready to impeach Richard Beck in the event that he misstated the nature of his connection to JEB Industries, Inc., and that there was no basis for the law firm, as experienced litigators, to "go into court with the naive assumption that [their] opponent is always going to speak the truth." Overall, the court declared that the law firm's failure to "nail the witness" during cross-examination is "too bad" and "what happens when [attorneys] don't prepare."

Thus, the court found that the evidence was not "newly discovered" because it could have been found easily by the law firm at the time of trial. We agree. As statutorily mandated corporate filings, the documents were matters of public record that could have been requested years prior to trial. The documents' unquestionable availability inevitably leads to the conclusion that the law firm simply failed to avail itself of the information. Moreover, the fact that the law firm knew well in advance that it planned to ask Richard Beck about his connection to JEB Industries, Inc., eliminates the last vestige of this argument. Lack of due diligence in preparing for cross-examination is clearly not a valid reason for requesting a new trial.

We also are not moved by the law firm's argument that not granting a new trial would allow the plaintiff "to perpetrate a fraud on the court." Our Supreme Court has stated that "[n]ew trials are not granted upon newly discovered evidence which discredits a witness unless the evidence is so vital to the issues and so strong and convincing that a new trial would probably produce a different result." (Internal quotation marks omitted.) *Burr* v. *Lichtenheim*, supra, 190 Conn. 355. Here, the

identities of the officers of JEB Industries, Inc., as well as the location of its corporate headquarters, were not "vital" issues in this vexatious litigation action. The introduction of this evidence at a new trial, therefore, would not be likely to produce a different result. As such, we cannot say that the court abused its discretion in this regard.

## D

### Improper Denial of Motion For Remittitur

In its motion for remittitur, the law firm argued that the jury award of $7238.31 was excessive and contrary to the evidence introduced at trial. After a hearing, the court denied the motion.

On appeal, the law firm claims that the denial of the motion for remittitur was improper because the judgment failed to take into account Salvatore Giannitti's $2500 payment to the plaintiff and $6639.41 that was credited back to the plaintiff's account allegedly as a result of the defendants' inquiries into the plaintiff's accounting records. The law firm also argues that the plaintiff never submitted evidence showing "actual payment for the handling of the prior action." These two factors, the law firm argues, meant that "the net effect of the prior lawsuit was that plaintiff suffered no monetary loss." Accordingly, the law firm concludes that the judgment should have shocked the court's sense of justice because the plaintiff was "compensated for a loss that it did not suffer" and "compensated twice for the same wrong." We are not persuaded.

"The amount of a damage award is a matter peculiarly within the province of the . . . jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the

size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 323, 852 A.2d 703 (2004).

"[I]n ruling on the motion for remittitur, the trial court was obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned was reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . The plaintiff need not prove damages with mathematical exactitude; rather, the plaintiff must provide sufficient evidence for the trier to make a fair and reasonable estimate." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Chaves*, 78 Conn. App. 342, 346–47, 826 A.2d 1286, cert. denied, 266 Conn. 911, 832 A.2d 70 (2003). In reviewing the court's denial of the law firm's motion for remittitur, we are limited to a determination of whether the court abused its discretion. See *Bruneau* v. *Seabrook*, 84 Conn. App. 667, 674, 854 A.2d 818 (damages award "will not be disturbed unless there is a clear abuse of discretion" [internal quotation marks omitted]), cert. denied, 271 Conn. 930, 859 A.2d 583 (2004).

The court concluded that the jury's damages award of $7238.31 most likely derived from an interrogatory directed to the plaintiff in which it reported that its "attorney's fees and disbursements" in the prior action totaled $7238.31. On the basis of that understanding, the court denied the law firm's motion for remittitur because it found the award to be properly supported by the evidence introduced at trial.

Given the evidentiary basis for the jury's damages award, we cannot say that the court abused its discre-

tion in denying the motion for remittitur. Although there were other figures in the record that could have yielded alternative calculations, "[t]he existence of conflicting evidence [further] curtails the authority of the court to overturn the verdict because the jury is entrusted with deciding which evidence is more credible and what effect it is to be given." (Internal quotation marks omitted.) *Hughes* v. *Lamay*, 89 Conn. App. 378, 384, 873 A.2d 1055, cert. denied, 275 Conn. 922, 883 A.2d 1244 (2005). As such, we reject the law firm's claim of error on this ground.

E

Improper Acceptance of Reply to Special Defense

The law firm next claims that the court improperly permitted the plaintiff to file a reply to its special defense at the beginning of trial. We disagree.

The record reveals the following relevant facts. At the start of trial on July 28, 2004, the court asked the parties for a copy of the operative pleadings. The plaintiff's counsel informed the court that he had on hand the reply to the law firm's special defenses. At that point, however, counsel for the law firm objected to the reply on the ground that the amended answer was dated October 30, 2003, but the plaintiff's reply was dated July 27, 2004. Because several months had passed before the filing of the reply, the law firm argued that the reply was untimely under our rules of practice. See Practice Book § 10-8 (requiring parties to file their reply within fifteen days of filing answer).[22]

[22] Practice Book § 10-8 provides in relevant part: "Commencing on the return day of the writ, summons and complaint in civil actions, pleadings . . . shall first advance within thirty days from the return day, and any subsequent pleadings . . . shall advance at least one step within each successive period of fifteen days from the preceding pleading . . . ."

The court then inquired as to how the case got onto the trial list without a certificate of closed pleadings. Counsel for the plaintiff stated that he did not file the reply until July 27, 2004, because he was waiting for the court to rule on his motion to strike the law firm's special defense concerning the alleged "dismissal" of the case. Although the court, *Radcliffe, J.*, granted the motion to strike on January 20, 2004, counsel for the plaintiff represented that he received notice of the court's decision only "a couple of days ago" because the ruling was not listed on the docket sheet's case detail or published in the Connecticut Law Journal. Further, he discussed his efforts to ascertain the status of the motion to strike, which included placing at least two telephone calls to the clerk's office and checking the judicial branch's Internet site.

Because the court exercised its judgment in accepting the belated reply, we review it under the abuse of discretion standard. See *Gianquitti* v. *Sheppard*, 53 Conn. App. 72, 76–77, 728 A.2d 1133 (1999); *Merritt* v. *Fagan*, 78 Conn. App. 590, 593, 828 A.2d 685, cert. denied, 266 Conn. 916, 833 A.2d 467 (2003). The court probed the explanation of the plaintiff's counsel for his failure to file the reply on time and then turned to other matters. Under these circumstances, we cannot say that the court's acceptance of the reply was an abuse of its discretion. Consequently, the law firm's argument in this regard must fail.

F

Improper Admission of Evidence

Next, the law firm claims that the court improperly allowed Khachian, the attorney representing Salvatore Giannitti, to testify as part of the plaintiff's rebuttal case. In that regard, the law firm argues that Khachian's

testimony was outside the scope of the evidence presented in the law firm's case-in-chief. Additionally, the law firm contends that Khachian's testimony about the execution of the release was inadmissible evidence of settlement negotiations. Neither argument is availing.

"The admission of rebuttal evidence ordinarily is within the sound discretion of the trial court. In considering whether a trial court has abused its discretion, appellate courts view such a trial court ruling by making every reasonable presumption in favor of the decision of the trial court." *Outdoor Development Corp.* v. *Mihalov*, 59 Conn. App. 175, 183, 756 A.2d 293 (2000).

Following the close of the law firm's case-in-chief, the plaintiff called Khachian to the witness stand for the first time. Khachian testified that he drafted the settlement agreement in his capacity as Salvatore Giannitti's attorney. He also outlined the events that occurred on February 25, 2003, the day that the parties signed the release. Finally, he testified about the circumstances that led to the signing of the settlement agreement. The law firm raised timely objections to Khachian's testimony on the grounds that it exceeded the scope of its case-in-chief and constituted impermissible evidence of settlement negotiations.

The transcript reveals that the court allowed the plaintiff to call Khachian on rebuttal because it had allowed the law firm similar latitude during its case-in-chief. Specifically, the court reasoned that the law firm had originally exceeded the scope of the plaintiff's case-in-chief by inquiring into the circumstances surrounding the execution of the release. Because it had allowed the law firm to engage in that line of inquiry during its case-in-chief, the court concluded that "[i]n all fairness," it should allow the plaintiff the opportunity to "rebut that case."

Having carefully reviewed the transcript, we cannot say that the court abused its discretion when it permitted the plaintiff to till soil that was originally unearthed during the law firm's case-in-chief. As such, this claim must fail.

Turning to the law firm's second argument that Khachian's testimony constituted inadmissible evidence of an offer of settlement, we begin by setting forth the applicable standard of review. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 328, 838 A.2d 135 (2004).

Section 4-8 of the Connecticut Code of Evidence prohibits the admission of evidence of a settlement or offer to compromise "on the issues of liability and the amount of the claim." Conn. Code Evid. § 4-8 (a). One of the express exceptions to the rule, however, is the admission of this type of evidence for another purpose. See id., § 4-8 (b) (1). In overruling the law firm's objection, the court took note of the law firm's special defense that the release discharged it of liability to the plaintiff. The court found no violation of § 4-8 because the plaintiff was offering evidence of the signatories' intent to

show the scope and effect of the release and not to establish liability.[23] We agree.

"The general rule is that evidence of an attempted settlement is not admissible against *either party to the settlement negotiations.*" (Emphasis added.) *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 209, 596 A.2d 396 (1991). Restricting the rule's application to the parties involved in settlement negotiations is part and parcel of the rule's goal of encouraging the settlement of disputes. See *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 332 ("[t]he purpose of § 4-8 . . . is to preclude the admission of settlement offers between parties who are opposing parties at the trial in which the evidence of the settlement is sought to be introduced"). In this case, the law firm was not a party to the settlement negotiations between the plaintiff and Salvatore Giannitti. As a nonparty to the settlement, the law firm has no basis for invoking the rule. Accordingly, the law firm's argument under § 4-8 must also fail.

G

Improper Jury Instruction

The law firm next claims that the court's instruction on probable cause improperly ordered the jury to apply a "higher, incorrect 'reasonable man' standard instead of the more lenient 'reasonable attorney' standard . . . ." Although the law firm concedes that it failed to object to the instruction, it requests that we grant review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40,

[23] Specifically, the court stated: "[N]ormally, settlement conferences are not relevant for purposes of showing liability. However, [the law firm], by pleading the benefit of the general release, that is, it is ambiguous on its face, opened the door to allowing evidence, not for the purposes of showing liability, [but] only for the purposes of showing the scope and effect of the release. So, any evidence of this nature will be received, will be received for that limited purpose."

567 A.2d 823 (1989),[24] or the plain error doctrine.[25] See Practice Book § 60-5.

A reading of the briefs reveals that the law firm did not raise the issue of *Golding* or plain error review in its principal brief. Further, although the law firm mentioned those issues in its reply brief, it provided no analysis whatsoever of how the facts satisfy the four prongs of *Golding* or the requisite elements of plain error review.

Our Supreme Court has clearly stated that "[o]ur practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal

[24] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the [party opposing the claim] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[25] "[T]he plain error doctrine, which is now codified at Practice Book § 60-5 . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 86–87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

quotation marks omitted.) *Grimm* v. *Grimm*, 276 Conn. 377, 394 n.19, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). In accordance with this practice, we have consistently held that "[t]his court will not review claims that are raised for the first time in a reply brief. That policy applies to requests for review under *Golding* as well as requests for review under the plain error doctrine." *Daniels* v. *Alander*, 75 Conn. App. 864, 882, 818 A.2d 106 (2003), aff'd, 268 Conn. 320, 844 A.2d 182 (2004). By asking for review for the first time in its reply brief, the law firm deprived the plaintiff of the opportunity to argue its position fully on this issue. Given the inexplicable deficiency of adequate notice to the plaintiff, we decline to address this claim.[26]

## II

## THE PLAINTIFF'S CROSS APPEAL

We finally reach the plaintiff's cross appeal from the court's denial of its motion for attorney's fees and statutory interest pursuant to § 52-192a. The plaintiff propounds various statutory and equitable arguments in favor of overturning the decision to deny its motion. Because we conclude that the requirements of § 52-192a (b) were satisfied in this case, we reverse in part the judgment of the court.

"The question of whether the trial court properly awarded interest pursuant to § 52-192a is one of law

---

[26] We also note that the law firm's lack of analysis of the four prongs of *Golding* and the applicability of the plain error doctrine would have precluded review even if it had been included in its principal brief. See, e.g., *Notopoulos* v. *Statewide Grievance Committee*, 85 Conn. App. 425, 434, 857 A.2d 424 (2004) ("failure to address the four prongs of *Golding* amounts to an inadequate briefing of the issue and results in the unpreserved claim being deemed abandoned" [internal quotation marks omitted]), aff'd, 277 Conn. 218, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006); *State* v. *Bourguignon*, 82 Conn. App. 798, 801, 847 A.2d 1031 (2004) (no analysis of claim of plain error considered failure to demonstrate manifest injustice).

subject to de novo review. Section 52-192a (b) requires a trial court to award interest to the prevailing plaintiff from the date of the filing of a complaint to the date of judgment whenever: (1) a plaintiff files a valid offer of judgment within eighteen months of the filing of the complaint in a civil complaint for money damages; (2) the defendant rejects the offer of judgment; and (3) the plaintiff ultimately recovers an amount greater than or equal to the offer of judgment." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 55, 717 A.2d 77 (1998).

The following facts are not in dispute. On June 7, 2002, the plaintiff filed a pleading entitled "[o]ffer of judgment directed to Modugno, Modugno & Modugno, LLC." The pleading stated that pursuant to § 52-192a, the plaintiff was willing to settle the case against the law firm and stipulate to a judgment for $10,000 "within 30 days . . . ."

At the time that the plaintiff made its offer of judgment, § 52-192a and Practice Book § 17-15 contained conflicting provisions regarding the amount of time during which an offer of judgment must be kept open.[27] Section 52-192a, as amended on October 1, 2001, stated that a plaintiff must allow the defendant sixty days within which to accept an offer of judgment. Practice Book § 17-15, however, required a plaintiff to afford the defendant only thirty days to accept an offer of judgment.[28]

---

[27] Practice Book (2002) § 17-15 provides in relevant part: "Within thirty days after being notified of the filing of such 'offer of judgment' and prior to the rendering of a verdict by the jury . . . the defendant . . . may file with the clerk of the court a written 'acceptance of offer of judgment' agreeing to a stipulation for judgment as contained in the plaintiff's 'offer of judgment.' . . ."

[28] On June 24, 2002, Practice Book § 17-15 was amended in order to increase the acceptance period to sixty days in accordance with the October 1, 2001, amendment to General Statutes § 52-192a. The amendment to Practice Book § 17-15, however, did not take effect until January 1, 2003.

The law firm never responded to the plaintiff's offer of judgment. In accordance with § 52-192a (a), its failure to accept the plaintiff's offer within sixty days constituted a rejection.

On August 4, 2004, the plaintiffs filed a motion requesting that the court award it $350 in attorney's fees and "interest from the date the complaint was filed to the date of judgment as provided by [Practice Book] § 17-18 . . . ." The court denied the plaintiff's motion on September 3, 2004. In doing so, the court acknowledged that at the time of the plaintiff's offer, § 52-192a and Practice Book § 17-15 required offers of judgment to remain open for different lengths of time. The court stated, however, that "[w]here a statute and a Practice Book rule are in conflict on a matter of substance, the provisions of the statute must prevail." Accordingly, because the terms of the plaintiff's offer stated that acceptance was necessary "within thirty days," the court held that it was not a valid "offer of judgment" under § 52-192a (a).

We must determine whether use of the conditional language "within thirty days" in an offer of judgment precludes recovery under § 52-192a. The facts of this case, as well as our review of the statutory language and policy goals sought to be accomplished thereby, persuade us that it does not.

First, there is nothing in § 52-192a (a) that requires an offer of judgment to state the length of time available for acceptance. On the contrary, the statute only requires offers of judgment to be "signed by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain . . . ." See General Statutes (Rev. to 2003) § 52-192a (a). A plaintiff is therefore not required to state in his or her offer of judgment that the defendant

has sixty days within which to file an "acceptance of offer of judgment" . . . . (Internal quotation marks omitted.) General Statutes (Rev. to 2003) § 52-192a (a). Including a reference to the statute's sixty day acceptance period in an offer of judgment is a mere courtesy, done in order to save the defendant from having to consult the language of the statute.

The goals of § 52-192a are also furthered by liberally examining offers of judgment when assessing compliance with the applicable statutory requirements. "The purpose of § 52-192a is to encourage pretrial resolution of disputes . . . to save the time and expense of trial . . . and, consequently, to conserve judicial resources. . . . [T]he strong public policy favoring the pretrial resolution of disputes . . . is substantially furthered by encouraging defendants to accept reasonable offers of judgment. . . . Section 52-192a encourages fair and reasonable compromise between litigants by penalizing a party that fails to accept a reasonable offer of settlement. . . . In other words, interest awarded under § 52-192a is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources." (Internal quotation marks omitted.) *Boyles* v. *Preston*, 68 Conn. App. 596, 615–16, 792 A.2d 878, cert. denied, 261 Conn. 901, 802 A.2d 853 (2002).

On the basis of these underlying policy concerns, this court has previously refused to require strict compliance with the mandates of § 52-192a (a). Specifically, the defendant in *Boyles* v. *Preston*, supra, 68 Conn. App. 596, argued that the plaintiff's offer of judgment was invalid because she did not file "a written 'offer of judgment' *signed by [him] or [his] attorney*," as required by § 52-192a (a). (Emphasis in original.) Id., 614. In that case, the plaintiff's offer of judgment was inscribed "Hanon W. Russell," the name of the plaintiff's

attorney, but was actually signed by a law partner of Russell's at his request. Id.

After reviewing the policy underlying § 52-192a, we concluded that the plaintiff "substantially complied with the statutory requirements . . . ." Id., 616. In particular, we noted that the defendant was "in no way disadvantaged by the mere circumstantial defect," and the offer was compliant to the extent that it afforded him actual notice of its existence and terms. Id. Finally, we observed that the irregularity in the offer "could not possibly have misled or prejudiced him." Id.

In this case, the plaintiff's inaccurate statement of the applicable period of time within which to accept the offer was unfortunate. Yet, the court appeared to accept the reasonableness of the mistake, given that Practice Book § 17-15 had not yet been amended to reflect the recent changes to § 52-192a. We also note the absence of any allegation that the plaintiff included this provision with the intent to mislead or deceive the law firm. The law firm also does not claim that it was actually misled or prejudiced in any way by the "thirty day" language in the offer of judgment.

It would contravene the policy of § 52-192a, as well as the prior decisional law of this court, to hold that the plaintiff's inadvertent reference to a thirty day acceptance period rendered its offer of judgment invalid. As a consequence, we conclude that the plaintiff satisfied the requirements of § 52-192a and, therefore, that the court improperly failed to award the plaintiff interest in accordance with the statute's provisions. Because the award of attorney's fees under General Statutes (Rev. to 2003) § 52-192a is left to the discretion of the court, we will allow the court on remand to determine, in the first instance, whether such an award would be appropriate in this case.

On the appeal, the judgment is affirmed. On the cross appeal, the judgment is reversed only as to the denial of the plaintiff's motion for interest and attorney's fees and the case is remanded for further proceedings to determine the amount of interest and the appropriateness of an award of attorney's fees.

In this opinion FLYNN, C. J., concurred.

BISHOP, J., concurring. While I agree with the majority's disposition of these appeals, I write separately to emphasize the legal and policy reasons that an appellate court should not accord review to an unpreserved claim that the trial court exhibited partiality toward a party at trial. The defendant law firm, Modugno, Modugno & Modugno, LLC (law firm), contends that the "court erred during trial when it advised [the attorney for the plaintiff, the Embalmers' Supply Company] on how to proceed during trial." The "advice" the court purportedly gave was its suggestion that the plaintiff's counsel "sit down, take a deep breath, take a minute or two and think" during a colloquy between counsel and the court regarding the admissibility of extrinsic evidence to explain the intent of the parties in the execution of a release. The law firm claims that, following this advice, the plaintiff's counsel then reversed his position on the issue, and the court correspondingly ruled in the plaintiff's favor.[1]

"[A]s a general rule, even in cases alleging judicial bias, this court will not consider the issue on appeal where the party failed to make the proper motion for disqualification at trial. . . . Failure to request recusal

[1] The law firm has separately claimed that the court's ruling on the admissibility of extrinsic evidence regarding the release was incorrect. Thus, it is not necessary to reach the law firm's untethered claim regarding judicial bias in order to resolve the evidentiary issue.

or move for a mistrial represents the [parties'] acquiescence to the judge presiding over the trial." (Citation omitted; internal quotation marks omitted.) *Schnabel* v. *Tyler*, 32 Conn. App. 704, 714, 630 A.2d 1361 (1993), aff'd, 230 Conn. 735, 646 A.2d 152 (1994); see also *Statewide Grievance Committee* v. *Friedland*, 222 Conn. 131, 146–47, 609 A.2d 645 (1992). "Our Supreme Court has criticized the practice whereby an attorney, cognizant of circumstances giving rise to an objection before or during trial, waits until after an unfavorable judgment to raise the issue. We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." (Internal quotation marks omitted.) *Fiddelman* v. *Redmon*, 31 Conn. App. 201, 213, 623 A.2d 1064, cert. denied, 226 Conn. 915, 628 A.2d 986 (1993); see also *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 543, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999).

Here, the law firm did not object to the court's "advice" to the plaintiff's counsel, move the court to recuse itself on the basis of a lack of impartiality or seek a mistrial. The record contains no indication that the law firm made an assertion of judicial misconduct or bias to the trial court. Rather, the law firm simply asserted that the court's ruling on the admissibility of evidence of the parties' intent in executing a release was "inappropriate." As noted, this evidentiary claim is separately set forth by the law firm on appeal and, I believe, properly assessed by the majority. Thus, I agree with the majority that the law firm's freestanding claim of impropriety is unpreserved and, consequently, unreviewable on appeal.

An unpreserved claim of improper judicial commentary has been held to be appropriate for review if it

implicates a constitutional right or pursuant to the doctrine of plain error. See *Honan* v. *Dimyan*, 63 Conn. App. 702, 778 A.2d 989, cert. denied, 258 Conn. 942, 786 A.2d 430 (2001); *State* v. *Gracewski*, 61 Conn. App. 726, 734, 767 A.2d 173 (2001); *State* v. *Harris*, 28 Conn. App. 474, 476–77, 612 A.2d 123, cert. denied, 223 Conn. 926, 614 A.2d 828 (1992); *State* v. *Anthony*, 24 Conn. App. 195, 210, 588 A.2d 214, cert. dismissed, 218 Conn. 911, 591 A.2d 813, cert. denied, 502 U.S. 913, 112 S. Ct. 312, 116 L. Ed. 2d 254 (1991). In this instance, because the claimed prejudicial effect of the court's "advice" to counsel was no more than an allegedly improper evidentiary ruling and the law firm's evidentiary claim was not coupled with an assertion that the court's alleged partiality denied it a fair trial, the claim does not rise to the level of a constitutional violation. Additionally, because the law firm has not sought plain error review, none is available to it. See *State* v. *Marsala*, 93 Conn. App. 582, 590, 889 A.2d 943 ("This court often has noted that it is not appropriate to engage in a level of review that is not requested. . . . When the parties have neither briefed nor argued plain error [or review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)], we will not afford such review." [Internal quotation marks omitted.]), cert. denied, 278 Conn. 902, 896 A.2d 105 (2006).

In addition to these legal reasons to decline review of the law firm's claim, there is a sound policy basis to decline as well. This court does not sit as a surrogate judicial review council. Indeed, our Supreme Court has opined that "when an attorney is confronted with what appears to be judicial misconduct, the appropriate avenue is the judicial disciplinary process . . . ." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 236, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006). Publicly aired unfounded claims of

judicial impropriety serve not only to denigrate the integrity of the judge subjected to such claims; they also tend to bring into disrepute the integrity of the judicial process to the detriment of the public's right to have confidence in government's adjudicative arm. Thus, there is good reason for our jurisprudence that mere claims of judicial misconduct, unmoored to the constitutional rights of a litigant and unclaimed for plain error review, should not find a hospitable response on direct appeal.

For the foregoing reasons, I respectfully concur in the majority opinion.